## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

David M. WOLFSON; Nuway Holding, Inc., a Nevada corporation; Momentous Group, LLC, a Utah limited liability company; Leeward Consulting Group, LLC, a Utah limited liability company; Sukumo Limited, a company incorporated in the British Virgin Islands (a.k.a. Sukumo Group Ltd., Fujiwara Group, First Chartered Capital Corporation, First Colonial Trust, First China Capital, and International Investment Holding); Michael Sydney Newman (A.K.A. Marcus Wiseman); Stem Genetics, Inc., a Utah corporation; Howard H. Robertson; Gino Carlucci; G & G Capital, LLC, an Arizona and Utah limited liability company; F10 Oil and Gas Properties, Inc.; Jon H. Marple; Mary E. Blake; Jon R. Marple; Grateful Internet Associates, LLC, a Colorado limited liability company; Diversified Financial

Resources Corporation, a Delaware corporation; John Chapman; Valesc Holdings, Inc., a New Jersey corporation; Jeremy D. Kraus; Samuel Cohen; NCI Holdings, Inc., a Nevada corporation, Defendants.

No. 2:03CV914 DAK.

United States District Court,
D. Utah,
Central Division.

April 7, 2004.

Thomas M. Melton, Esq., Karen L. Martinez, Securities and Exchange Commission, Salt Lake City, UT, for plaintiff.

David M. Wolfson, Salt Lake City, UT, pro se.

Howard H. Robertson, Riverton, UT, pro se.

Gino Carlucci, Salt Lake City, UT, pro se.

John P. Harrington, Esq., Mona Lyman Burton, James L. Barnett, Gavin M.

Reese, Sarah G. Schwartz, Holland & Hart, Salt Lake City, UT, for receiver.

Richard O. Weed, Esq., Weed & Co LLP, Newport Beach, CA, William B. Parsons III, Esq., Salt Lake City, UT, Erik A. Christiansen, Esq., Parsons Behle & Latimer, Michael S. Golightly, Esq., Salt Lake City, UT, for defendants.

Mark A. Flores, Esq., Michael N. Zundel, Esq., G. Troy Parkinson, Prince Yeates & Geldzahler, Salt Lake City, UT, for movants.

## MEMORANDUM DECISION AND ORDER

KIMBALL, District Judge.

This matter is before the Court on six motions: (1) Receiver's Motion For Clarification of Contempt Order; (2) Gino Carlucci and G & G Capital, LLC's (the "Carlucci Defendants") Motion to Amend or Partially Vacate Order Expanding Receivership; (3) Carlucci Defendants' Motion for Certification Under Either FRCP 54(b) or 28 U.S.C. § 1292(b); (4) Carlucci Defendants' Motion to Vacate Order on Declaration and First Report of Receiver; (5) Commission's Motion to Strike Cross Claims and Third Party Complaint; and (6) Carlucci Defendants' Motion to Strike Affidavit of Corey Adams. The Court has also elaborated upon its ruling from the bench on March 15, 2004 that this action may proceed as an exception to the automatic stay under the United States Bankruptcy Code.

A hearing on the Carlucci Defendants' Motion for Certification Under Either FRCP 54(b) or 28 U.S.C. § 1292(b) was held on March 31, 2004. In addition, a hearing on the Carlucci Defendants' Motion to Amend or Partially Vacate Order Expanding Receivership and on the Receiver's Motion For Clarification of Contempt Order was held on April 5, 2004. At these hearings, the Carlucci Defendants were represented by Jeffrey W. Shields and J. Colby Clark. The Commission was represented by Thomas M. Melton and Karen L. Martinez, and the Receiver was represented at the April 5, 2004 hearing by Mona L. Burton and James L. Barnett.

Before the hearings, the Court considered carefully the memoranda and other materials submitted by the parties. Since taking the matters under advisement, the Court has further considered the law and facts relating to the motions. In addition, the Court has ruled on the remaining pending motions without oral argument, after careful consideration of the memoranda and other material submitted by the parties. Now being fully advised, the Court renders the following Memorandum Decision and Order.

The underlying allegations by the Commission against the Carlucci Defendants in this case have been set forth in this Court's Order dated December 10, 2003, which denied the motions of various Defendants-including the Carlucci Defendants-to dismiss the claims against them based on their argument that this Court lacked subject matter jurisdiction over this action.

## I. ELABORATION ON THE COURT'S MARCH 15, 2004 BENCH RULING REGARDING THE EFFECT OF THE AUTOMATIC STAY PROVISION

On February 18, 2004, the Commission filed a Motion to Hold Gino Carlucci in Contempt (the "Contempt Motion") for violating this Court's Asset Freeze Order, which had been entered on October 16, 2003, and which the court specifically refused to vacate on December 19, 2003. In addition, on February 18, 2004, the Commission filed a Motion to Expand the Receivership (the "Receivership Motion") to

include the assets of Gino Carlucci and G & G (the "Carlucci Entities").

In asking this Court to hold Carlucci in contempt, among other things, the Commission provided significant evidence that Carlucci had not only failed to disclose various bank accounts to the Commission, but also that he transferred at least $430,360.63 in direct violation of the Asset Freeze Order. The Commission also pointed out that Carlucci had manipulated both the Commission and this Court into releasing living expenses in the amount of $ 8,222.00 per month. Specifically, on October 17, 2003, the Commission agreed to release $24,666.00 to Carlucci for three months of living expenses. Fewer than three months later, on December 19, 2003, based on Carlucci's plea for additional living expenses to care for his family and basic needs and the Commission's refusal to release additional funds, the Court ordered the Commission to release another $24,666.00 to Carlucci's Living Expenses Account. In its Contempt Motion, the Commission claimed that Carlucci had been falsely pleading poverty to the Commission and this Court while, at the same time, transferring at least $430,360.63 in direct violation of the Asset Freeze Order.[1]

Because the Carlucci Defendants sought more time to respond to the Commission's Contempt and Receivership Motions, at a hearing on February 20, 2004, the Court continued the hearing on the Commission's motions. Although the Commission sought to schedule a hearing for the following week, the Court indulged the request of Carlucci's counsel to delay the hearing, based on counsel's busy schedule. Accordingly, the Court scheduled oral argument on the Commission's motions for March 5, 2004 at 3:00 p.m.

In his March 3, 2004 Memorandum in Opposition to Motion to Hold Defendant Carlucci in Contempt, Carlucci utterly failed to dispute the Commission's evidence that he had violated the Asset Freeze and failed to offer any meritorious argument as to why he should not be held in contempt. Instead, he made unmeritorious objections concerning the Commission's accountant's declaration, which had been filed in support of the Contempt Motion, and Carlucci resurrected the unmeritorious argument that the original Asset Freeze Order, filed on October 16, 2003, was improperly entered.[2]

---

1. In seeking additional living expenses, Carlucci provided an Affidavit dated December 15, 2003, stating that "I am now short of living expenses." In addition, he claimed that "[t]he Asset Freeze is creating significant hardship to me. Not only will I be prevented from paying basic living expenses for my wife and two children, but it has virtually frozen business activities of G & G going forward because of the nature of G & G's business.... [I]n addition, I have had to borrow money from my father which, at my age and station in life, is personally embarrassing." Aff. of Gino Carlucci dated December 15, 2003.

2. To clarify the Court's often-reiterated ruling on this issue, the Court has found that the October 16, 2003 Asset Freeze Order was properly entered. Indeed, the Court denied the Carlucci Defendants' Motion to Vacate the

Asset Freeze Order on December 19, 2004. More importantly, however, the Court has recently emphasized that, since the Asset Freeze Order was entered in October 2003, and since the Court declined to vacate the Freeze Order in December 2003, the Commission has provided even further evidence to support the continuation of an Asset Freeze Order as to the Carlucci Defendants. In contrast, the Carlucci Defendants have failed to provide any admissible evidence to demonstrate that the Commission's allegations against them are wrong, despite having had several opportunities to do so.

While Carlucci has often complained to this Court-and apparently now to the Arizona Bankruptcy Court-about the allegedly draconian measures that have been taken against him in this action without any finding on the merits, Carlucci apparently ignores the exis-

Apparently recognizing his predicament in this action, Carlucci sought refuge in the bankruptcy court less than four hours before the March 5, 2004 hearing on the Commission's motions. Both Carlucci and G & G Capital filed petitions for bankruptcy under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona, thereby creating significant confusion among the parties as to the ability of this court to proceed.

Not to be deterred, however, the Commission appeared at the March 5, 2004 hearing and was ready to proceed with the Contempt and Receivership Motions. Armed with large binders containing hundreds-if not thousands-of pages of documents ostensibly supporting its claims, the Commission argued that this action was excepted from the automatic stay provision under the Bankruptcy Code. The Carlucci Defendants, however, argued that it would be a violation of automatic stay to proceed with the hearing. In fact, they argued that the automatic stay precluded any further proceedings in this Court.

Out of an abundance of caution, the Court agreed not to proceed at that time. However, notwithstanding the argument of the Carlucci Defendants that the automatic stay likely precluded any further action in the instant case, the Court requested briefing from the parties regarding the effect of the automatic stay. Despite the urgency claimed by the Commission, and again to accommodate Carlucci's counsel's schedule, the Court delayed the hearing on the issue until March 15, 2004. In addition, although the court preferred to proceed on March 15, 2004 with the Contempt and Receivership Motions if it determined at that time that the automatic stay did not apply to this action, at the request of Carlucci's counsel, the Court set a separate hearing on the motions for March 17, 2004.

At the March 15, 2004 hearing pertaining to the effect of the automatic stay provision on this action-and specifically with regard to the Contempt and Receivership Motions that had been scheduled to be heard on March 5, 2004-this Court, after carefully reviewing the parties' briefs and their supporting case law, conducting independent research, and after listening to the arguments of counsel, ruled that the automatic stay provisions of 11 U.S.C. § 362(a) did not stay this enforcement action, and thus, that the hearing on the Contempt and Receivership Motions would proceed on March 17, 2004.[3] On March

---

tence of a significant amount of evidence provided by the Commission against him, and he fails to recognize that he has not offered any evidence to the contrary. Indeed, he has invoked his Fifth Amendment right not to incriminate himself. *See* Statement of Gino Carlucci Regarding Requirement of Contempt Order to Give Accounting filed March 23, 2004 ("Carlucci has been informed that he is the subject of a criminal investigation by the United States Attorney concerning the subject matter of this action. Carlucci declines to give the accounting pursuant to the Fifth Amendment to the United States Constitution as the information requested may tend to incriminate him.") Although not necessary in light of the significant evidence submitted by the Commission, in civil proceedings, the

Court may draw adverse inferences from his invocation of that right. *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Doe v. Glanzer*, 232 F.3d 1258 (9th Cir.2000); *LiButti v. United States*, 107 F.3d 110, 121 (2nd Cir.1997).

**3.** To the extent that the Carlucci Defendants believed that the hearing-or the Court's bench ruling-was limited in scope to whether the Court could proceed with merely the two scheduled motions, such a belief is unfounded. The Commission's memorandum addressing the effect of the automatic stay clearly addressed whether the action as a whole was stayed. Had the Carlucci Defendants understood the numerous cases cited by the Commission on that point, they would have

17, 2004, this Court granted the Commission's motions and entered an Order of Contempt Against Gino Carlucci and an Order Expanding the Receivership.

Based on the recent actions of the Carlucci Defendants, however, it appears they did not understand the Court's ruling regarding the effect of the automatic stay. Despite this Court's ruling that the action was excepted from the stay, the Carlucci Defendants filed a Motion for a Temporary Restraining Order in the United States Bankruptcy Court for the District of Arizona seeking to enjoin the Commission from proceeding in the instant action.[4] In addition, on March 25, 2004, the Carlucci Defendants also indicated to Magistrate Judge Nuffer that, because of the bankruptcy filing and the dispute over the scope of the exception to the automatic stay, they were not bound by this Court's Order scheduling briefing on the issue of privileges asserted by the Commission in the deposition of Scott Frost. *See* Letter from Commission to Magistrate Judge Nuffer, dated March 25, 2004, lodged in file. Thus, the Carlucci Defendants have again demonstrated their willingness to flout the Orders of this Court. Due to the Carlucci Defendants' apparently confusion regarding this Court's bench ruling, the Court now elaborates on its previous ruling that this action is excepted from the automatic stay under Bankruptcy Code Section 362(b)(4).

■ At the outset, the Court finds that it has jurisdiction to determine its own jurisdiction, as well as to decide whether the automatic stay is applicable to the instant litigation. *See In re Baldwin–United Corp. Litig.*, 765 F.2d 343, 347 (2nd Cir.1985) ("The Court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the precise question whether the proceeding pending before it is subject to the automatic stay."); *Securities & Exchange Comm'n v. Bilzerian*, 131 F.Supp.2d 10, 13–14 (D.D.C.2001); *Securities & Exchange Comm'n v. First Fin. Group of Tex.*, 645 F.2d 429, 437–40 (5th Cir.1981); *cf. In re Pincombe*, 256 B.R. 774, 781 (Bankr.N.D.Ill.2000) (stating that because the § 362(b)(4) exception takes effect immediately, a governmental agency is not required to seek relief from the stay before continuing proceedings against a debtor).

■ This Court has concurrent jurisdiction with the Bankruptcy Court to determine the effect of the bankruptcy proceeding on this case. *See United States Dep't of Housing & Urban Dev't v. Cost Control Marketing & Sales Mgm't*, 64 F.3d 920, 927 n. 11 (4th Cir.1995) (citing *Brock v. Morysville Body Works, Inc.* 829 F.2d 383 (3rd Cir.1987)), *cert. denied*, 517 U.S. 1187, 116 S.Ct. 1673, 134 L.Ed.2d 777 (1996); *see also In re Dolen*, 265 B.R. 471, 476 (Bankr. M.D.Fla.2001) (noting that "[t]he district court has concurrent jurisdiction with the

realized that there is no question that this enforcement action is excepted from the automatic stay, and that, implicit in the Court's ruling that it would proceed with the Contempt and Receivership Motions, was the determination that this action as a whole was excepted from the stay. The only limitation was that the Commission could not enforce a money judgment.

4. The Carlucci Defendants recently argued that this Court's Order requiring them to withdraw their bad-faith bankruptcy petitions was "preposterous" because, they argued, the ruling had the impermissible effect of enjoining the Bankruptcy Court from proceeding. Despite their unabashed criticism of the Court's ruling, the Carlucci Defendants have themselves sought the same "preposterous" result in the Bankruptcy Court by asking that Court to enjoin the Commission and the Receiver from proceeding in the case at bar-even after this Court ruled that this action can and will proceed.

bankruptcy court to determine the extent to which the Section 362 automatic stay limits the actions of the Commission in its ability to pursue the pending district court action.").

Further, as the *Cost Control* court noted, "because the district court's jurisdiction attached first in time, it was superior." *Id.; see also United States v. Delta Distributors Co., Inc.,* 1996 WL 460112 (June 21, 1996 S.D.W.Va.) (finding that "because this Court's jurisdiction attached first in time, it is superior."). Similarly, in *Klass v. Klass,* the court determined that "[t]he clearly predominant rule is that jurisdiction is concurrent, and that the court in which the non-bankruptcy case is pending may determine the effect of the stay on that case." 377 Md. 13, 831 A.2d 1067, 1071 (App.2003) (citing numerous federal cases).

In so ruling, this Court does not usurp the power of or exercise any authority over the Bankruptcy Court. The Bankruptcy Court certainly could have determined the issue. However, because this action has been pending in this Court since October 2003 and the bankruptcy petitions were only recently filed, and because this court has expended significant time and resources on this action since October and was ready to proceed with the Commission's Contempt and Receivership Motions when the bankruptcy petitions were filed, it made sense from a judicial economy perspective to determine the effect of the automatic stay on this case. Moreover, the Carlucci Defendants have failed to provide any authority to support their claim that, in this situation, the Bankruptcy Court's determination would somehow trump this Court's determination. Thus, it is unclear to the court why the Carlucci Defendants have sought to have the Bankruptcy Court enjoin the Commission and

the Receiver from proceeding in this action.

■ Having determined that this Court may determine whether the automatic stay applies in this action, the Court concludes that the Commission's prosecution of this civil fraud action is excepted from the automatic stay under the Bankruptcy Code Section 362(b)(4), which provides a regulatory exception to the automatic stay. In 1998, Congress amended section 362(b)(4) to make clear that governmental police and regulatory actions are excepted from section 362(a)(3) of the Bankruptcy Code, which stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 3 Collier on Bankruptcy ¶¶ 362.05 & 362.05[5][b] at pp. 362–57 through 362–63 (15th ed. Rev. Sept. 2002).

Section 362(b)(4) of Title 11 of the United States Code provides:

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—...

> (4) under (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

11 U.S.C. § 362(b)(4).

■ It is well settled that the primary purpose of Commission enforcement actions is to promote public policy and safety by ensuring fair and equitable securities

markets. *See, e.g., First Fin. Group*, 645 F.2d at 439; *SEC v. Towers Fin. Corp.*, 205 B.R. 27, 30 (S.D.N.Y.1997). Indeed, in *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000), the court found that the purpose of the section 362(b)(4) exception "is to prevent a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court." *See also United States v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir.1988) (analyzing a similar provision of section 362 prior to the 1998 amendment and finding that "where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety or similar police or regulatory laws, *or attempting to fix damages for violation of such a law,* the action or proceeding is not stayed under the automatic stay.") (emphasis in original); *Federal Trade Commission v. R.A. Walker & Assocs., Inc.*, 37 B.R. 608, 610 (D.D.C.1983) (recognizing that the filing of a petition in bankruptcy usually stays pending judicial litigation but noting that "[d]efendants admit that this proceeding is 'an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power' and also concede, as they must, that the proceeding itself is not automatically stayed.") As the Ninth Circuit has explained:

> By deterring violations of the securities laws, disgorgement actions further the Commission's public policy mission of protecting investors and safeguarding the integrity of the markets. Although the Commission at times may use the disgorged proceeds to compensate injured victims, this does not detract from the public nature of Commission enforcement actions: "the touchstone remains the fact that public policies are served and the public interest is advanced by the litigation."

*SEC v. Rind*, 991 F.2d 1486, 1491 (9th Cir.1993) (citation omitted); *see also SEC v. Elmas Trading Corp.*, 620 F.Supp. 231, 240–41 (D.Nev.1985) (determining that the Commission's civil action seeking disgorgement and injunctive relief was excepted from the automatic stay), *aff'd*, 805 F.2d 1039 (9th Cir.1986).

Courts have explicitly held that the exception to the automatic stay provision "extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment." *CFTC v. Co Petro Marketing Group, Inc.*, 700 F.2d 1279, 1283 (9th Cir.1983); *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir.2000) (finding that it is well established that the "government unit exception" of Section 362(b)(4) permits the entry of a money judgment against a debtor so long as the proceeding in which such a judgment is entered is one to enforce the governmental unit's police or regulatory power); *Bilzerian v. SEC*, 146 B.R. 871, 873 (Bankr.M.D.Fla.1992) ("While there is no question that the automatic stay provisions prevent the SEC from attempting to enforce any disgorgement award, this Court is satisfied that the mere fixing of the award is well within the provisions of 11 U.S.C. § 362(b)(4)."). The Carlucci Defendants have failed to provide any authority to support their belief that the automatic stay precludes the Commission from proceeding in a case such as this one.

Thus, it is abundantly clear that continuation of the instant action, brought in the public interest by the Commission, is excepted from the automatic stay provision of the Bankruptcy Code. The Commission admitted at the March 15, 2004 hearing that is not seeking and cannot seek to *enforce* any money judgment at this time. It is permitted, however, to seek, and, if successful, *obtain* entry of a money judgment from this Court.

Inherent in this conclusion is the determination that the civil contempt proceeding against Carlucci is not stayed. *See David v. Hooker, Ltd.,* 560 F.2d 412, 418 (9th Cir.1977) (ruling that actions to be stayed would not include contempt proceedings arising out of disobedience of an order made prior to the stay); *SEC v. Bilzerian,* 131 F.Supp.2d at 13–14 (finding that contempt proceedings are excepted from the automatic stay, not only under the regulatory exception, but also under the court's authority to uphold the dignity of the court and to vindicate the authority of the court to enforce its orders); *SEC v. Kenton Capital, Ltd.,* 983 F.Supp. 13, 14–15 (D.D.C.1997) (same).

Moreover, this Court may also order the return of funds pursuant to the exception to the automatic stay provision. *See Co Petro,* 700 F.2d at 1282 (finding that the district court had jurisdiction to enforce the terms of its preliminary injunction, which included an asset freeze order, by ordering the appellant law firm to disgorge $60,000 in fees to the Receiver, which the law firm had obtained in violation of the asset freeze order.). The Ninth Circuit explained that the automatic stay provision "does not divest the district court in this case of jurisdiction to issue an order to aid the receiver in collecting and preserving property of the estate." *Id.* at 1283. The Ninth Circuit further explained that to allow "the district court to enforce its pre-liminary injunction by directing return of the $60,000 to the receiver would in no way frustrate the jurisdiction of the bankruptcy court."

Through its Contempt Motion, the Commission sought an order that would require Carlucci to right the wrong he committed when he diverted substantial funds in direct violation of this Court's Asset Freeze Order. Thus, the Commission was exercising its "police and regulatory" power under the federal securities laws. There is no question that the exception to the automatic stay applies to the Contempt Motion.

■ Finally, the automatic stay exception also permits this Court to appoint a receiver. *See First Fin. Group,* 645 F.2d at 436–40; *Co Petro,* 700 F.2d at 1282–83 (determining that the court had the authority to order the return to the receiver funds taken in violation of the asset freeze); *SEC v. Elmas Trading Corp.,* 620 F.Supp. 231, 240–41 (D.Nev.1985), *aff'd,* 805 F.2d 1039 (9th Cir.1986).[5]

In *Elmas,* the receiver moved the court for an order modifying the Permanent Injunction and the Order Appointing Permanent Receiver that had been previously entered by the court to expand the scope of the receivership and include additional entities. An entity included in the receiver's petition had recently filed for bankruptcy. The court found that the bank-

---

**5.** At the March 17, 2004 hearing on the Contempt Motion-two days after the Court had ruled on the effect of the automatic stay-counsel for the Carlucci Defendants attempted to discredit the Commission for its alleged failure to provide a citation pertaining to the *Elmas* case and for the Commission's alleged misrepresentation of the holding of the *Elmas* case in its memorandum regarding the effect of the automatic stay. While it is true that the Commission provided only a pin cite and not a full citation in its brief during the relevant discussion-quite an insignificant infraction, if one at all-the Court had readily found and read the *Elmas* case prior to the March 15 hearing regarding the effect of the automatic stay, the full citation to which had been provided only a few pages earlier in the Commission's brief and also in its Table of Authorities. Contrary to the puzzling accusations of Carlucci's counsel that the only *Elmas* case that he could find had nothing to do with the proposition cited by the Commission, the Commission's characterization of the case was, not surprisingly, entirely accurate.

ruptcy filing did not stay the receiver's motion. The court stated that the "petition for bankruptcy does not operate to stay the action before this Court. . . . The policy behind th[e] police or regulatory exception to the automatic stay is to prevent the bankruptcy court from becoming a haven for wrongdoers." 620 F.Supp. at 240–41 (internal citations and quotations omitted).

As stated by the Fifth Circuit in *First Financial,* "[t]he appointment of a temporary receiver . . . itself serves to prevent dismemberment of the corporate estate by management personnel who have been found to have acted fraudulently and who could otherwise easily dispose of the assets to the detriment of the bettor's creditors." *First Financial Group,* 645 F.2d at 439; *see also Securities & Exchange Comm'n v. Brennan,* 230 F.3d 65, 80 (2nd Cir.2000) (Calabresi, J., dissenting) (recognizing that "where courts have feared the dissipation of assets still under a debtor's control, they have regularly countenanced governmental action to safeguard those assets during the pendency of the bankruptcy proceedings.").

Further, in *Federal Trade Comm'n v. R.A. Walker & Assocs.,* 37 B.R. 608 (D.D.C.1983), a case similar to the instant case, the defendants argued that their voluntary petitions in bankruptcy, which were filed eight days after the district court entered a temporary restraining order, divested the court of jurisdiction over the defendants' assets. The court found that it had jurisdiction over and authority to issue and continue the freeze over the defendants' assets, notwithstanding the pendency of bankruptcy proceedings and that the maintenance of the freeze, pending appointment of a trustee in bankruptcy or a receiver, or both, is necessary to prevent dissipation of the assets. *Id.* at 609–10. In *Walker,* the defendants argued

that the jurisdiction over the debtors' assets lies exclusively with the bankruptcy court. *Id.* at 610. The *Walker* court found that "[t]he case law and legislative history clearly reject this position." *Id.*

In reaching its determination, the *Walker* court reviewed several cases, including *SEC v. First Financial Group of Texas,* 645 F.2d 429 (5th Cir.1981). It noted that the district court in *First Financial* had appointed a temporary receiver to take control of the defendants' assets, despite the fact that the defendants had recently filed for bankruptcy. *Walker,* 37 B.R. at 610. The *Walker* court noted that the Fifth Circuit in *First Financial* upheld the appointment of a receiver and the freeze of the assets. *Id.* (citing *First Financial,* 645 F.2d at 437). The *Walker* court also analyzed *CFTC v. Co Petro Marketing Group, Inc.,* 700 F.2d 1279 (9th Cir.1983). In *Co Petro,* the Ninth Circuit upheld the district court's jurisdiction regarding the appointment of a receiver and which enjoined the defendants from transferring their assets. After the preliminary injunction was issued, the defendants filed a voluntary petition in bankruptcy and challenged the district court's jurisdiction over their assets. The *Co Petro* court found that "[t]he district court's order in this case is not the enforcement of a money judgment; rather, *it is the enforcement of the district court's injunction against transferring or dealing in Co Petro assets.*" *Walker,* 37 B.R. at 611 (quoting *Co Petro,* 700 F.2d at 1284) (emphasis in *Walker*).

Importantly, the *Walker* court also disagreed with the defendant's argument that the asset freeze operated to preserve the assets for the preferential benefit of a single class of putative creditors. The court, however, determined that the freeze "merely protects and preserves the assets from further transfer or dissipation by the defendants. The ultimate distribution of

those assets which are determined to be part of the 'property of the state' may still be made by the Bankruptcy Court." *Id.* at 611. Further, the court noted that the defendants had assumed that the assets which were frozen would automatically be part of the "property of the estate" and thus subject to administration in bankruptcy. *Id.* The *Walker* court observed, however, that such a conclusion is far from foregone because the assets "of the defendants' estate which were acquired by fraud may not be 'property of the estate,' and thus not within the jurisdiction of the Bankruptcy Court." *Id.* at 612.

Similar to the case at bar, the *Walker* court recognized that the defendants in *Walker* remained debtors-in-possession and that no separate trustee in bankruptcy or receiver had been appointed. *Id.* It noted that under various sections of the Bankruptcy Code, debtors-in-possession retain all the rights of a trustee, which includes the right to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing." *Id.* The *Walker* court lamented that "[a]lthough debtors-in-possession are supposed to act as fiduciaries and stand in the shoes of a trustee in bankruptcy, the Court cannot find that this 'duty' alone offers sufficient protection of the assets." *Id.* The *Walker* court found that the defendants "should not be allowed to remain in control of their assets under Chapter 11. Given the freedom of a debtor-in-possession and the charges which are involved in this case, to lift the freeze order without a trustee or receiver to take control would be to leave the defendants free to dispose of their assets virtually at will." *Id.* at 612. The court proceeded to recognize that

[t]he district court's exercise of its equity power in this respect [appointment of a receiver over defendants' assets] is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit . . . . the . . . injunctive action was brought.

*Id.* at 612–13. Thus, the court "retains full jurisdiction over the case and over the defendants' assets." *Id.* at 613.

In the instant case, the Court similarly finds that this "duty" does not offer sufficient protection of the assets. The Commission has provided significant evidence to support its securities fraud allegations pertaining to the Carlucci Defendants and also justifying the continuing existence of the Asset Freeze Order regarding the Carlucci Defendants. Moreover, the Commission has amassed more than sufficient (and unrebutted) evidence that Carlucci has repeatedly violated this Court's Asset Freeze Order, while at the same time representing to the Commission and this Court that he was in need of living expenses. For this and other reasons, Carlucci's credibility has been significantly undermined in this litigation.

Accordingly, this Court finds that this litigation is excepted from the automatic stay. The Commission may pursue this action through the point of obtaining a money judgment, assuming it prevails. However, it may not, after obtaining a money judgment, enforce such a judgment against the Carlucci Defendants under the present circumstances pertaining to the bankruptcy petitions. The assets that were frozen pursuant to the October 16, 2003 Asset Freeze Order remain within the jurisdiction of this Court, and the

Court hereby orders that the Carlucci Defendants surrender such assets to the Receiver, as discussed below, to be reserved from further transfer or dissipation. Such a transfer will protect and preserve the assets from further dissipation by the Carlucci Defendants. As clarified below regarding the amendment to the Receivership Order, such assets may not be liquidated except upon further order of this Court.

## II. RECEIVER'S MOTION FOR CLARIFICATION OF CONTEMPT ORDER

The Receiver has filed a Motion for Clarification of Contempt Order. Indeed, both the Receiver and counsel for the Carlucci Defendants expressed their differences in interpretation of the Contempt Order during the Court's hearing on March 24, 2004. In the Contempt Order, among other things, this Court ordered Carlucci to "immediately and no later than 12:00 noon on March 23, 2004, file a motion to withdraw his bankruptcy petitions."[6] At the March 24, 2004 hearing, the Court declined to resolve the ambiguity.

In their response to the Receiver's Motion to Clarify Contempt Order, however, the Carlucci Defendants incorrectly claim that the Court ruled on this issue, stating, "[i]nitially, the Receiver asserted this language required that the Carlucci Entities immediately turn over their assets to the Receiver; however, this Court clarified that the Carlucci Entities' assets were only to be turned over the Receiver upon the dismissal of the bankruptcy petitions." *See* Mem. in Resp. to Mot. for Clarification

of Contempt Order at 3 n. 4. In support of this claim, they attach a page from the transcript that appears to support their position; however, they have omitted the next page of the transcript, which contains information relevant to, but unsupportive of, their position. At the hearing, the following exchange took place:

Mr. Shields: I thought I heard an implication that Mr. Carlucci is obligated to turn his assets over now. And that's not what your order said. It said when bankruptcy is dismissed, a motion is filed.

The Court: I don't have the order in front of me, but my recollection is it's like what you're saying.

Mr. Shields: Yeah, it is. Thank you.

Mr. Harrington: Can I ask for a clarification in regards to that, Your Honor? Therefore he's not obligated to turn over his assets upon the filing of his withdrawal of the bankruptcy petition?

Mr. Shields: He can't do it under 112(b). And we had a discussion about that at the Receiver's office, and that is you have to file a notice to all creditors under the bankruptcy code.

The Court: Which he's done.

Mr. Shields: Which he's done. But we don't know that outcome of that yet. The bankruptcy court has its own—you don't just go in like a Rule 41 dismissal and say, boom, it's withdrawn. You can't do that. But I'm sure that's what the Court had in mind because until then, it's under the jurisdiction of the bankruptcy court.

The Court: I think that's right.

---

6. The Court acknowledges that reasonable minds could differ on the interpretation of the Court's language in the Contempt Order that Carlucci "shall (after withdrawing his bankruptcy petitions) immediately surrender all assets of G & G Capital and Gino Carlucci . . . to the Receiver . . . ." The Carlucci Defen-

dants argued at the March 24, 2004 hearing that they were not required to surrender their assets until the Bankruptcy Court granted his "Involuntary" Motions to Withdraw. The Receiver argued that the Carlucci Defendants were required to turn over their assets upon filing the withdrawal motions.

Mr. Broadbent: Your Honor? Mr. Broadbent. What Mr. Shields says about dismissal of the case is entirely true. However, he's not prevented to turn over the assets as the Court has ordered.

*The Court: I'll have to look at my order again.*

Mr. Shields: Your Honor, it I turn those assets over, we're in contempt of the Arizona court, and we're between a rock and a hard place. And I think the Court's order is very clear in that regard. And I don't want to bear an accusation that we're not in compliance because we've complied.

*The Court: I'll see you next week at 10 o'clock.*

(Whereupon, the court proceedings were concluded.)

Tr. of March 24, 2004 Motion Hearing at pp. 42–43 (emphasis added).

Thus, the need to clarify the Contempt Order is obvious, notwithstanding the Carlucci Defendants' insistence to the contrary.[7] In addition, the Carlucci Defendants have further obfuscated this litigation by interpreting the Contempt Order to require only that they file a motion to withdraw and not that they were required withdrawal of their petitions. Carlucci apparently believed that he could purge his contempt by filing an "Involuntary Motion to Withdraw Petitions Under Protest" (the "Involuntary Motion") and then advocating against its being granted. In his Involuntary Motion, Carlucci states that "the Debtors do not believe that withdrawal or dismissal of one or both of the proceedings is in the best interest of all creditors and parties in interest in accordance with 11 U.S.C. § 1112 and Rule 1017 Rule [sic] of Bankruptcy Procedure."[8] *See* Involuntary Motion at 1. Further, while the Bankruptcy Rules permit a withdrawal motion to be scheduled on twenty-days notice, Carlucci delayed noticing the hearing and instead requested an April 27, 2004. In his Withdrawal Hearing Notice, Carlucci states his objective to undermine his Involuntary Motion:

The Involuntary Motion was filed under protest by the Debtors in order to comply with an order entered against the

---

7. The Court, however, declines to grant the specific relief sought by the Receiver, i.e., striking the Bankruptcy Court's hearing on the Carlucci Defendants' Motion for a Temporary Restraining Order and otherwise enjoining further Bankruptcy Court's proceedings that do not bear on the withdrawal issue. *See* Motion for Clarification of Contempt Order and "Relief Sought in Motion for Clarification," which was filed on April 6, 2004.

While the Court views such attempts by the Carlucci Defendants to request that the Bankruptcy Court "overrule" this Court, as an unfortunate waste of judicial and litigant resources and-due to the significant expenses being incurred by the Receiver-a further dilution of the pool of potential funds available to compensate the defrauded investors in this action if the Commission prevails on its claims, it is beyond this Court's authority to dictate to the Bankruptcy Court whether to proceed.

8. Carlucci appears to have requested that Corey Adams ("Adams") file an Objection of Dismissal by Creditor in the Bankruptcy Court, stating that "[i]t would not be in the interest of this or other creditors in this matter to have this action dismissed." *See* Ex. H, dated March 29, 2004, attached to Mem. in Supp. of Mot. for Clarification of Contempt Order at Ex. Adams is a business associate of Carlucci's-apparently sometimes a friend (*see* discussion below at n. 13 regarding Receiver's motion for a restraining order against Carlucci, Adams, and Wayne Mounts for allegedly participating in numerous thefts of Asset Property and otherwise interfering with the Receivership) and sometimes an enemy (see discussion below at 29–32 regarding Adams' testimony regarding Carlucci's knowledge that his investment schemes were illegal and Carlucci's attempt to intimidate Adams and others).

Debtors in another Court. While the Debtors do not believe that withdrawal/dismissal of the case is in the best interest of creditors and all parties in interest nor do the debtors believe the Involuntary Motion can be granted under the applicable standards under [11] U.S.C. § 1112, given the SEC and the receiver's apparent intentions and actions to date, a hearing is required under applicable rules of procedure.

In addition, counsel for the Commission called Carlucci's bankruptcy counsel and asked him to stipulate to extending the Arizona Court's April 8, 2004 temporary restraining order hearing [to enjoin the Commission and receiver from pursuing the instant action] until after the Bankruptcy Court had ruled on the Involuntary Motion to Withdraw. Counsel declined unless the Commission would stipulate to an immediate appeal of the Contempt Order. The Receiver moved the Bankruptcy Court to accelerate the withdrawal hearing date up to April 8, 2004 so that it could rule on that motion before requiring the Commission and Receiver to participate in the hearing on the motion for a temporary restraining order and other bankruptcy matters, such as the Creditors' Meeting, scheduled for April 13, 2004 and the Receiver's response to the Adversary Complaint (due on April 14, 2004), which Carlucci served on the Receiver on March 24,

seven days after this Court's Contempt Order was entered. Rather than facilitate the expeditious resolution of his Involuntary Motion to Withdraw, Carlucci instead filed an objection, arguing that the Receiver's request to expedite the hearing is "only further evidence of violations of the automatic stay." [9] The Bankruptcy Court denied the Receiver's motion to expedite the withdrawal hearing.

In light of the mountains of evidence against Carlucci not only on the merits of the instant action, but also with regard to his violations of the Asset Freeze Order and his failure to purge his contempt, this Court hereby amends the Contempt Order in the following respects.

III. First, the Court eliminates the requirement in Section III to withdraw/dismiss the bankruptcy petitions. The Commission and/or the Receiver may continue, if they desire, to pursue dismissal of the petitions. The elimination of this withdrawal requirement does not affect the Court's finding that, for the reasons stated by the Commission in its Memorandum Regarding the Effect of Automatic Stay Provisions of 11 U.S.C. § 362(a) and its Memorandum in Support of Motion to Hold Carlucci in Contempt, that Carlucci and G & G's voluntary bankruptcy petitions were filed in bad faith and as a vexatious and contemptuous effort to vio-

---

**9.** Carlucci even resisted the Receiver's giving notice to the Bankruptcy Court of this Court's Contempt Order. Carlucci moved to strike the Notice of Entry of Order of Contempt Against Gino Carlucci and Order Expanding Receivership Over Assets of Gino Carlucci and G & G Capital, LLC. In his motion to strike, he again claims that the Receiver's Notice is "yet another flagrant violation of the automatic stay" and that it is "evidence of the actions being pursued by the SEC and receiver in violation of the stay in their attempts to usurp [the Bankruptcy Court's] exclusive jurisdiction." Carlucci also complains in his

motion about the "scandalous accusations and the alleged findings" that the Commission and Receiver obtained with inadmissible evidence and without due process of law.

As stated before, Carlucci has failed to confront head-on the Commission's mounting evidence against him; rather, he makes conclusory and unsupported allegations about his plight in this action. Having failed to succeed in this Court, and apparently seeing the writing on the wall, he has sought refuge in the Bankruptcy Court as a debtor-in-possession of his allegedly ill-gotten gains.

late this Court's Asset Freeze Order.[10] *See also Securities & Exchange Comm'n v. Sterns,* 1991 WL 204901, Fed. Sec. L. Rep. P. 96,200 (C.D.Cal. Apr.25, 1991).

Having eliminated the withdrawal requirement, however, the Court also amends section IV of the Contempt Order. Regardless of the existence of the bankruptcy petitions, Carlucci shall immediately surrender all assets of G & G Capital and Gino Carlucci, either individually or under any name whatsoever, to the Receiver, Richard Clayton, as set forth in the Order Expanding Receivership. Failure to surrender all assets by 12:00 noon on Wednesday, April 14, 2004, will result in the issuance of a bench warrant upon notice from the Receiver that Carlucci has failed to comply. Carlucci will be incarcerated until he complies in full, regardless of any relief sought or obtained in the Bankruptcy Court.

The Carlucci Defendants have improperly sought refuge from their wrongdoing in Bankruptcy Court. To permit Carlucci to be a debtor in possession of his assets, where he remains free to dissipate what might remain of his ill-gotten gains, is an entirely unacceptable state of affairs.

## III. THE CARLUCCI DEFENDANTS' MOTION TO AMEND OR PARTIALLY VACATE ORDER EXPANDING RECEIVERSHIP

The Carlucci Defendants have requested that this Court amend its March 17, 2004 Order Expanding Receivership because the Order currently grants the Receiver the power to liquidate assets without further Order of the Court.[11] At the March

---

**10.** The Carlucci Defendants insist that it is "clear that *only* bankruptcy courts may, in the first instance consider dismissals of bankruptcy cases for bad faith" and that the Receiver ignores "clear precedent" in arguing to the contrary. *See* Mem. in Resp. to Mot. For Clarification at 4. The cases they relied upon by the Carlucci Defendants, *In re Universal Clearing House Co.,* 60 B.R. 985, 993 (D.Utah 1986) (Winder, J.) and *In re Independent Clearing House Co.,* 77 B.R. 843, 850 (D.Utah 1987) (Jenkins, J.), as they bear on this issue, are inapposite. They stand for the unremarkable proposition that because the bad faith issue requires a factual determination, it may not be raised in the first instance on appeal from the bankruptcy court to the district court. This Court is not sitting as an appellate court in this action.

**11.** The Carlucci Defendants also complain that the Order was drafted by the Commission and was not submitted to counsel for review and approval pursuant to DUCivR 54–1(a) and (b). However, they do not dispute that they received a copy of the proposed Order on or about February 20, 2004, approximately 26 days prior to the hearing on the motion. The Carlucci Defendants are apparently under the misguided belief that "an order of this Court should not be drafted until a party prevails, and upon the same, the prevailing party should submit to the non-prevailing party a 'proposed' order for consent or objection." Mem. in Supp. of Motion to Amend at 8. They further complain that "the Court merely entered the ('proposed') order without giving counsel for the Carlucci Entities an opportunity to consent or object to the same." *Id.* While the Carlucci Defendants' position would be accurate if the Commission had submitted the proposed order after a bench ruling, the Court's ruling in this instance was not made from the bench. The Court adopted the Commission's proposed Order as its own.

This Court is certainly not alone in its practice of occasionally adopting a proposed Order of a party-particularly when time is of the essence and an Order submitted by counsel reflects the Court's ruling after careful consideration of the issue. Indeed, the District of Utah website regarding this Court's practices and procedures specifically requests that proposed orders be submitted with motions. In this instance, not only are the Carlucci Defendants inaccurate regarding the procedures of the federal court, but their objection on this ground is all the more bewildering considering that they had the Commission's proposed Order for almost a month prior to the hearing on the motion, yet they failed to raise any objections until after the Order was entered.

31, 2004 hearing, the Commission stipulated to modifying the Order to state that the Receiver may not liquidate any assets except upon further Order of this Court. Notwithstanding the Commission's stipulation in open court, which appeared to resolve the Carlucci Defendants' concern, the Carlucci Defendants, in their reply memorandum-which was filed approximately 41 days after the Carlucci Defendants had notice of the proposed Order, 15 days after entry of the Order, and less than one business day before the hearing on the motion-raised an entirely new concern. They now complain about the provision relating to the ability of the Receiver to take possession, have access to, and review all mail or any other communication in any form, of the Carlucci Entities or of its agents, officers and directors.[12]

The Court agrees that this provision in the Receivership Order is too broad, but the changes requested by the Carlucci Defendants render the provision too narrow. The Court requests that the parties attempt to stipulate to reasonable language relating this provision. If no stipulation can be reached, the parties may submit their own proposed language. Either a stipulation or each party's proposed language must be submitted by 5:00 p.m. on April 19, 2004. Because the Carlucci Defendants did not raise this issue in their opening brief, thereby precluding the Commission from responding to it, the Commission may, if it chooses, file a response, not to exceed five pages, along with any proposed language.

## IV. THE CARLUCCI DEFENDANTS' MOTION FOR CERTIFICATION

Due to this Court's above amendment to the Contempt Order, which eliminates the requirement to withdraw the bankruptcy petitions-the basis for Carlucci's motion for certification under Rule 54(b) or 28 U.S.C. 1292(b)-the Carlucci Defendants' motion to certify is denied as moot. Should the Carlucci Defendants desire certification of any other issue, the Court will consider such a motion-after full briefing by the parties-provided that the assets of the Carlucci Defendants, as defined in the Order Expanding Receivership, have been surrendered to the Receiver. Otherwise, such a motion will be summarily denied.

## V. CARLUCCI DEFENDANTS' MOTION TO VACATE ORDER ON DECLARATION AND FIRST REPORT OF RECEIVER

The Carlucci Defendants demand that "this Court *MUST* vacate the Receiver Order and require that the Receiver Declaration be first served on the 'Companies,' in its entirety, for scrutiny and inspection." Mot. & Mem. to Vacate Order on Declaration and First Report of Receiver at 4. The Carlucci Defendants claim that the Receiver served his Declaration upon the Carluc-

---

**12.** Despite having been deprived of the opportunity to brief the new issue, the Commission professionally responded to the new issue at the April 5, 2004 hearing.

In contrast, the Carlucci Defendants claimed in their April 6, 2004 response to the Receiver's Motion for Clarification of the Contempt Order-which was filed three days prior to the April 5, 2004 hearing on another motion, and after both the Receiver and the Carlucci Defendants had highlighted the need for clarification of the Contempt Order at the March 24, 2004 hearing-that the Receiver had

acted in "bad faith" and should be sanctioned for his "vexatious conduct in forcing the Carlucci Entities to respond to the Receiver's outlandish motion" in which the Receiver seeks additional relief "at the eleventh hour." *See* Mem. in Resp. to Mot. for Clarification of Contempt Order and Mot. for Sanctions Against the Receiver at 12. As demonstrated above, the Receiver's Motion was a justifiable attempt to seek guidance in light of the Carlucci Defendants' continued selective perception of events relating to this litigation.

**628**

ci Defendants by mail on the same day that this Court signed the proposed Order authorizing payment. They complain that no exhibits were attached to their copy of the Declaration, and that the "Companies," are defined by the Receiver Declaration and the Receiver Order to include the Carlucci Entities.

The Carlucci Defendants emphasize that "District Courts *MUST* scrutinize fee applications to ensure that they are reasonable." *Id.* at 3. They claim that the Declaration must first be served on the "Companies" and allow the parties in interest to object based on various grounds for "both reasonableness and to protect from any potential windfall."

The Court declines to vacate the Order for a variety of reasons. First, the Carlucci Defendants fail to recognize that this Court, when appropriate, enters Orders that, based on the Court's own determination of reasonableness, the Court would enter regardless of objections from interested parties. This is done to short-circuit the need for parties to incur fees in re-

sponding when such a response is very unlikely to persuade the Court to alter its determination. Further, if a party genuinely believes that the Court entered such an Order in error, it may move to vacate the Order, providing specific reasons why the Order should be vacated.

Second, the Carlucci Defendants have failed to provide any reasons why the fees incurred by the Receiver were unreasonable. Indeed, the irony of this motion is not lost on the Court: the party complaining about the Receiver's payment is the party who appears to be unnecessarily running up the Receiver's tab by pursuing vexatious, duplicative, and unnecessary proceedings in the Bankruptcy Court, repeatedly disregarding this Court's authority, and allegedly interfering with the current Receivership entities.[13]

Finally, while the Carlucci Entities are listed as "Companies" in the Receivership Order, the fact remains that Carlucci has thus far avoided turning over the assets of the Carlucci Entities to the Receiver. While this situation will likely change in

---

13. The Receiver has filed a Motion for Restraining Order Against Gino Carlucci, Wayne Mounts, and Corey Adams (the "Carlucci Group"). The Receiver claims-and provides 14 Declarations of various employees who claim to have personal knowledge of the actions of Carlucci, Mounts, and Adams-that these individuals are actively interfering with the Receivership. The Receiver claims that Adams and Mounts knew Carlucci in Arizona when Carlucci lived there, and then they moved to Utah and have or had been involved in the Receivership entities. According to the Receiver and his supporting Declarants, the Carlucci Group's recent involvement has been characterized by violence, intimidation, disregard of this Court's orders, and dealing in illegal activities, including habitual stealing from Receivership entities. The Carlucci Group's actions range from calling up scheduled performers [for Club DV8, which is now controlled by the Receiver] and telling them not to come to work, to cornering staff and telling them that the Commission cannot pro-

tect them and that neither the Commission nor the Receiver "has any idea who they are f___ing with." Adams was allegedly arrested and charged with second degree burglary and Class A assault for illegally entering the Albee Square Club, located next to Club DV8, with several accomplices and assaulting a member of the band practicing there. The testimony provided by the 14 Declarants regarding the interference with the Receivership, along with the intimidation and physical threats to those who assist the Receiver or the Commission are deeply troubling. *See generally* Mem. in Supp. of Mot. for Restraining Order Against Gino Carlucci, Wayne Mounts, and Corey Adams and the 14 Declarations supporting the motion. Carlucci and Mounts have agreed to stipulate to a restraining order (because Carlucci claims that such testimony is untrue), which is currently being negotiated. Carlucci and Mounts have reserved the right to challenge at a later date the testimony against them.

the next week, until the Carlucci Entities are, in reality, "Companies" in the possession and control of the Receiver, they have no standing to object to the Order authorizing payment.

Once the Carlucci Defendants comply with this Order by surrendering their assets, as defined above, and if the Carlucci Defendants have specific and supportable objections as to the reasonableness of the requested fees, they may renew their motion to vacate.

## VI. COMMISSION'S MOTION TO STRIKE CROSS–CLAIMS AND THIRD–PARTY COMPLAINT

On January 12, 2004, the Carlucci Defendants filed a Cross–Claim and a Third–Party Complaint. On January 13, 2004, the Commission filed a Motion to Strike Cross Claims and Third–Party Complaint, explaining that Section 21(g) of the Exchange Act bars third-party claims and cross claims unless consented to by the Commission and that the Commission did not consent to this filing. Because the Commission is correct, and also because the relevant Defendants failed to oppose this motion, it is granted.

## VII. CARLUCCI DEFENDANTS' MOTION TO STRIKE AFFIDAVIT OF COREY ADAMS

During the December 19, 2003 hearing on the Carlucci Defendants' Motion to Vacate the Asset Freeze Order as to the Carlucci Defendants, the Commission provided an affidavit submitted by Corey Adams. In that affidavit, Adams provided incriminating testimony regarding David Wolfson ("Wolfson") and Carlucci. Specifically, Adams offered information about Wolfson's and Carlucci's use of money from overseas investors to pay for bands at Club DV8 and Saltair. He claimed that "[e]verything Carlucci has made in Salt

Lake City he has made off the backs of investors who were scammed with Wolfson, Carlucci and Sukumo." He testified that Carlucci now has a Hummer, a Ferrari that he bought in summer 2003, and a Mercedes SUV. He claimed that Carlucci "bragged about how the Commission cannot get him on anything and about how he is going to get all his money back." Adams also asserts that Wolfson and Carlucci were "very up front about the fact that ... what they were doing was illegal." He also states that Carlucci wanted to hire someone to kill an individual whom Carlucci suspected was talking about him to the Commission. Adams takes credit for persuading this alleged hit man not to hurt the individual. Adams also asserts that Carlucci had previously paid an individual "to beat people up." Finally, Adams claim that Carlucci had an individual try to injure or kill Adams.

During the December 19, 2003 hearing, the Carlucci Defendants argued that the Court could not consider the Affidavit because Adams was a drug dealer and a "scallywag" and could not be believed. On January 13, 2004–approximately one month after the Court's ruling-the Carlucci Defendants moved to strike the Adams Affidavit, claiming that it contained no information relevant to the asset freeze and also contained inaccurate information that was not based on Adams' personal knowledge. The Carlucci Defendants, however, did not provide any specific examples of any claimed inaccuracies or evidentiary problems. They also attached a new Adams Affidavit (apparently believing that, despite their previous claims that Adams could not be believed, the new January 2004 affidavit was worthy of belief) seeking to withdraw and retract his earlier testimony.

In the new January 2004 affidavit, Adams claims that he did not have an

opportunity to read the December 2003 Affidavit in its entirety and that he was "concerned" that it was not accurate, was improperly compiled, and either misconstrued or misinterpreted." *See* Aff. of Corey Adams, attached as Ex B. to Carlucci Defs.' Mem. In Supp. of Mot. to Strike the Aff. of Corey Adams. He claims that he was not "coerced or put in duress in any way" to retract his earlier statements. Similar to the Carlucci Defendants' supporting memorandum, however, Adams also fails to identify a single inaccuracy or other problem that may have existed in the very detailed December 2003 Affidavit. Thus, in neither the memorandum supporting the motion to strike nor the January 2004 Adams Affidavit purporting to retract his earlier testimony, is there mention of even one inaccuracy or specific evidentiary infirmity.

In contrast, the Declarations provided by the three different Commission personnel who met with Adams to create his earlier December 2003 Affidavit tell quite a different story. They all verify that Adams initiated contact with the Commission, provided all the information in the Affidavit, which on its face appears to be based on Adams' personal knowledge, and that he signed the Affidavit after thorough review. Indeed, they claim that the Commission revised the draft twice at Adams' request, and they provided the various drafts containing Adams' revisions and input. *See* Exhibits attached to Declaration of Jennifer E. Gully. He provided the same information to Commission personnel at two different meetings, and the Commission did not promise anything for his cooperation with the Commission. In addition, the Commission personnel with whom Adams met told him that they were going to use the Affidavit in court, and he did not object. Declarations from two Commission attorneys reveal that Adams was fearful of retaliation for providing the

testimony. For example, he stated that "what he knew about Mr. Carlucci made him concerned for his own safety, as well as that of his fiancee." *See* Decl. of Jennifer E. Gully at ¶ 5; Decl. of Karen Martinez at ¶ 10. He was told by the Commission to contact the FBI. *Id.*

Thus, the Court finds that the Carlucci Defendants' motion to strike is wholly without merit, and the Court declines to strike the Affidavit from the record.

## VIII. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that (1) Receiver's Motion For Clarification of Contempt Order [Docket # 312] is GRANTED, and the Court has herein AMENDED the March 17, 2004 Order of Contempt Against Gino Carlucci; (2) the Carlucci Defendants' Motion to Amend or Partially Vacate Order Expanding Receivership [Docket # 271] is GRANTED in part and DENIED in part. The Commission has stipulated to AMENDING the Order to state that the Receiver may not liquidate any assets except upon further Order of the Court; (3) the Carlucci Defendants' Motion for Certification Under Either FRCP 54(b) or 28 U.S.C. § 1292(b) [Docket # 269] is DENIED AS MOOT; (4) the Carlucci Defendants' Motion to Vacate Order on Declaration and First Report of Receiver [Docket # 314] is DENIED without prejudice to renew the motion; (5) Commission's Motion to Strike Cross Claims and Third Party Complaint [Docket # 178] is GRANTED, and the Cross Claims and Third Party Complaint of Gino Carlucci and G & G Capital is STRICKEN; and (6) Carlucci Defendants' Motion to Strike Affidavit of Corey Adams [Docket # 175] is DENIED. The Court has also elaborated upon its ruling from the bench that this

action may proceed as an exception to the automatic stay.