SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

ELMAS TRADING CORPORATION, Republic Overseas Bank, Ltd., James L. Attarian, and Donald D. Smith, Defendants.

No. CV–R–85–263–ECR.

United States District Court,
D. Nevada.

Sept. 3, 1985.

232

Kerry C. Feffer, Caludia Z. Grossfeld and Robert D. LaFramenta, S.E.C., Los Angeles, Cal., for plaintiff.

Thomas Nolan, Maryann Marzano, James Ridley Ferrand and Thomas L. Taylor, III, Beverly Hills, Cal., for Republic Overseas Bank, Ltd.

Robert J. Fry, Reno, Nev., for Elmas Trading Corp.

John Vandevelde and Stephen B. Sadowsky, Los Angeles, Cal., for Attarian & Smith.

## ORDER

EDWARD C. REED, Jr., District Judge.

The permanent Receiver in this case moves this Court for an order modifying

the Permanent Injunction and the Order Appointing Permanent Receiver previously entered on June 24, 1985. Our June 24, 1985, order prohibited the disposition or transfer of assets, documents and records on accounts and entities related to or affiliated with Elmas and/or ROBL. The Receiver seeks a modification of these orders to include the designation of certain entities and accounts as being related to, or affiliated with, Elmas and ROBL. This would extend the prohibition and restraint of the transfer or disposition of any assets, documents and records pertaining to the Receiver's proposed entities or accounts.

This case represents a complex set of interrelated companies. The Receiver has done an admirable job of making his way through the difficult web of entities and corporations. More and more we read of investment schemes set up in this way in order to hide assets in an attempt to keep innocent investors from receiving the return of their money. As this Court noted at the August 23, 1985, hearing, it is crucial that defendants James Attarian and Donald Smith are not able to dissipate money that rightfully belongs to those investors in Elmas and/or ROBL and their related affiliates or subsidiaries.

This Court has, however, reviewed the motion with the view that the Receiver must show beyond mere speculation that these entities should be brought within the Receivership.

In support of his argument that these entities should be included within the Receivership, the Receiver argues that we should pierce the corporate veil. Further, he argues that these various entities are merely the alter egos of the entities already within the Receivership.

In opposition to the Receiver's motion, defendants argue that not only are these entities separate and distinct, but to include them within the Receivership violates the due process rights of the entities. If this Court finds that these entities are not separate and distinct from Elmas and ROBL, then there would be no problem of any taking of property without due process.

If, however, this Court finds that these entities are separate and distinct, then sufficient notice would be needed before further action could be taken.

 The alter ego doctrine, which is remedial in nature, is not applied to eliminate the consequences of corporate operations, but to avoid inequitable results. To invoke the doctrine against a party, we must find that the party was an actor in the course of conduct constituting the abuse of corporate privilege—we may not apply the doctrine to prejudice an innocent third party.

 Under the doctrine of alter ego liability, this Court may disregard the corporate entity and treat the acts of the corporation as if they were done by the controlling corporation lying behind the corporate shell or the individuals. *Kersh v. General Council of the Assemblies of God,* 535 F.Supp. 494, 496 (N.D.Cal.1982), *citing* 6 Witkin, *Summary of California Law: Corporations* § 5. We must determine under the facts presented to us and for the purposes of this motion only, whether to disregard the corporate entities.

 To pierce the corporate veil, fraud or other wrongful purpose need not be proven. *Schattner v. Girard, Ind.,* 668 F.2d 1366, 1370 (D.C.Cir.1982). Just as with the alter ego doctrine, it is sufficient that if we recognized the separate corporate existence, we would bring about an inequitable result. *Cunningham v. Rendezvous, Inc.,* 699 F.2d 676, 680 (4th Cir. 1983).

 Other factors to be considered in piercing the corporate veil are: failure to observe corporate formalities; nonpayment of dividends; the insolvency of the debtor corporation at the time; siphoning of funds of the corporation by the dominant stockholder; nonfunctioning of other officers or director; absence of corporate records; use of the same office or business location by the corporation and its individual stockholders; and the fact that the corporation is merely a facade for the operations of the

dominant stockholder or stockholders. The conclusion to disregard the corporate entity does not, however, rest on a single factor, but often involves a consideration of the mentioned factors; the particular situation must generally present an element of injustice or fundamental unfairness. *See* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 41 (rev. perm. ed. 1980).

Consideration can also be given to: the comingling of funds and other assets; the unauthorized diversion of funds or assets to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identity of equitable ownership in the two entities; the identity of the officers and directors of the two entities, or of the supervision and management; the absence of corporate assets; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest or concealment of personal business activities; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; the use of the corporate entity to procure labor, services, or merchandise for another person or entity; the diversion of assets from a corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; the contracting with another with intent to avoid performance by the use of a corporation as a subterfuge of illegal transactions; and the formation and use of a corporation to transfer to it the existing liability of another person or entity. *Arnold v. Browne*, 27 Cal.App.3d 386, 103 Cal.Rptr. 775, 781–782 (1972); *Amfac Mechanical Supply Co. v. Federer*, 645 P.2d 73, 77–78 (Wyo.1982).

Under federal law, a corporate entity may be disregarded in the interests of public convenience, fairness, and equity, and in applying this rule the federal courts will look closely at the purpose of the federal statute involved to determine whether it places importance on the corporate form. *See Town of Brookline v. Gorsuch*, 667 F.2d 215, 220 (1st Cir.1981); *Capital Telephone Comp. Inc. v. F.C.C.*, 498 F.2d 734, 738 (D.C.Cir.1974). Federal analysis gives less respect to the corporate form than does the strict common-law alter ego doctrine. *Id.*

This case arose under the Securities and Exchange Act and was brought by the Securities and Exchange Commission, the principal watchdog of those violating the securities' laws. The government has a keen interest in preventing the unlawful manipulation and use of securities.

Further, the Receiver's primary objective in this case is to ensure that all available assets are brought within the Receivership and may then be properly distributed to creditors. We will, therefore, apply a more flexible approach in determining whether the corporate entity should be disregarded.

Initially, we note several facts which provide an umbrella to the discussion of the individual entities. Money flowed between Elmas, ROBL and the various entities. The Receiver has discovered numerous checks between several of the companies. On many, James Attarian is the signatory. Further, the Receiver has found no explanations for several of the transactions. It appears that no services were performed by some of the companies. There are apparently no records of legitimate business purposes and the Receiver has been unable to find normal business records.

Defendants Attarian and Smith intermingled funds of Elmas and ROBL with the subsidiary and affiliate entities and the records and ledgers maintained for them are incomplete and do not conform to standard business practices. In many instances Elmas and ROBL were treated as shell corporations through which Attarian and Smith operated. It also appears that sever-

al of these entities relied heavily on Elmas and ROBL for any business transactions. This raises the inference of intertwined operations and mere corporate shells.

This Court notes that several of these entities were incorporated within a few months of each other and during the same period that Attarian and Smith were raising millions of dollars from investors. Also, several were incorporated by the same company, Laughlin and Associates. The inference from this is that these entities are a part of the complex web which Attarian and Smith wove. In addition, many of the entities list Attarian, Smith and/or relatives as officers of the corporations.

Finally, we note that the Receiver noticed a request to examine defendants James Attarian and Donald Smith for the August 23, 1985, hearing. Through their attorney, both refused to be examined at the hearing or to attend the hearing. Their attorney represented to this Court that they would not testify because of their assertion of the fifth amendment privilege against self-incrimination and/or the attorney-client privilege. At the hearing, the Court acknowledged our consideration of the assertion of the fifth amendment in deciding the Receiver's motion for modification. Not only did Attarian and Smith refuse to testify, they did not submit any affidavits with their opposition to the Receiver's motion. The Receiver is correct when he notes that these two men may be the only ones who possess the information of the status of these various entities. Thus, this assertion is a pivotal issue in trying to determine whether to include the Receiver's proposed entities in the Receivership.

Keeping in mind the general principles of law and facts previously discussed, we turn to the individual entities. The parties have stipulated that the following entities are related to, affiliates of, or subsidiaries to Elmas and/or ROBL:

1. Trust Equities, Ltd.;
2. International Management and Accounting (IMAC);
3. COMPAC Technologies, Inc.;
4. Elmas Mining Corporation; and
5. Paychute Mining Corporation.

The motion to modify the Order Appointing Receiver and Preliminary Injunction will be granted as to these entities.

The following list is those entities in dispute: Elite Corp.; EMC Corp.; Ehlmas Corp.; Lynx Mining Corp.; Eden Financial Corp.; Arbour Financial, N.V.; Truth Share, Inc.; Elmatec, S.A.; ETC Corp.; Ass'n of Financial Consultants, Inc.; Fortex Corp.; and Gold Equities, Ltd.

*Elite Corp.*

█ Elite Corporation (Elite) is a Nevada corporation formed by defendant Attarian and his wife, Phyllis, which ostensibly performed consulting services for Elmas. Pursuant to documents filed with the Nevada Secretary of State, Elite was incorporated on May 29, 1984, by Laughlin Associates, Inc., and its present officers are:

(a) Edwin L. Johnson, President (who is also the President of IMAC and son-in-law of defendant Attarian);

(b) defendant Attarian, Secretary (defendant Attarian was previously the President of Elite); and

(c) Phyllis Attarian, Treasurer.

The principal place of business of Elite is listed as Reno, Nevada, and its corporate purpose is to engage in "all legal activities." Its name was changed on August 20, 1984, from "Elite Investors, Inc." to its present name.

From business records, the Receiver was unable to determine what, if any, consulting services were actually performed by Elite for Elmas, although Elite has received a total of $32,512.50 from Elmas and IMAC as compensation for such services. Elite also maintained an account with ROBL and the balance in such account as of April of 1985 was $31,750.00.

It was frustrating for this Court to learn at the August 23, 1985, hearing that money which had been in an account for Elite at the time this motion was made has now been entirely withdrawn.

We find that Elite should be included in the Receivership.

*EMC Comp.*

█ EMC Company (EMC) is a company formed under the laws of Turks & Caicos Islands, British West Indies. The imprinted checks utilized by EMC drawn on an account with the Valley Bank of Nevada evidence a mailing address and telephone number in the Turks & Caicos Islands. Ledgers maintained by Elmas recording monthly distribution of checks, reveal that two payments had been made by Elmas to EMC for an "advance on expenses" in the total sum of $7,000.00. Such payment were made by Elmas to EMC during the months of May and June of 1984.

Further, the Receiver's review of the various accounting and other records of Elmas and ROBL uncovered files for EMC containing bank statements, bank registers, cancelled checks and deposit slips. Bank statements for EMC from the Valley Bank of Nevada were transmitted to EMC at an address in Reno, Nevada, which in fact is the same address utilized by Elite, defendant Attarian's "consultant corporation." The EMC bank account with the Valley Bank of Nevada was evidently closed in July of 1984. Following the review of returned cancelled checks payable on the EMC bank account with the Valley Bank of Nevada, it appeared that the majority of disbursements were of a personal nature, or to religious organizations or societies. All checks reviewed bore the signature of defendant Attarian.

The Receiver has, therefore, demonstrated that EMC used the same business location, intermingled business records with Elmas and ROBL and used assets for personal interest. We, therefore, reject the recognition of EMC as distinct and will grant the Receiver's motion as to EMC.

*Ehlmas Corp.*

█ The place of incorporation of Ehlmas Corporation (Ehlmas) is presently unknown. Following a search of corporate records on file with the Nevada Secretary of State, the Receiver determined that Ehlmas was not a Nevada corporation. Following a review of ledgers and bank statements either maintained or received by Elmas, the Receiver determined that payments totaling $13,000.00 were made to Ehlmas by Elmas.

In addition, an invoice bearing the date of August 13, 1984, prepared and sent by FORMAR ELECTRONICS, INC. (FORMAR) (a company located in Santa Barbara, California) to Ehlmas at the same address utilized by Elmas and ROBL reflects that "trading supervision, operation and maintenance" services were performed by FORMAR on behalf of Ehlmas. The total equity in Ehlmas' account with FORMAR totaled $2,721,247.39 as of July 31, 1984. Both Ehlmas and Elmas use the same office suite and mailing address. Further, a similar contractual relationship exists between FORMAR (such contract was originally entered with Advanced Market Technology, a Utah Corporation which later merged with FORMAR on June 21, 1983) and Elmas for FORMAR to perform the very services referred to on FORMAR's invoice with Ehlmas. Attarian and Smith argue that the second contract reflected a typographical error and should also have read "Ehlmas."

Although Ehlmas utilized the same address, the Receiver was unable to provide any information concerning the ownership, control or organization of Ehlmas. Thus, while the Receiver was able to raise an issue as to whether Ehlmas should be included in the Receivership, this Court is unable to include it. The motion will, therefore, be denied as to Ehlmas.

*Lynx Mining Corp.*

█ Lynx Mining Corporation (Lynx) incorporated in Nevada in 1983, held itself out to the public as a Nevada corporation formed in 1982. It was incorporated by Robert J. Fry, Esq., an attorney with the law firm which is counsel of record in this case for Elmas and ROBL. The officers of Lynx include:

(a) Jay Landis, President; and

(b) Richard H. Sanborn, Secretary.

The Receiver notes that Jay Landis appears to have been an officer of Paychute Mining Company (Paychute). The Receiver asserts that Lynx was the predecessor to Paychute. Counsel for defendants Attarian and Smith concede that Paychute is related to Elmas and ROBL and should be included in the Receivership. Lynx, arguing through Mr. Fry, contends Lynx was not the predecessor to Paychute. The financial statements for the period August 19, 1982, through October 31, 1983, prepared by the Reno, Nevada, accounting firm of Pangborn & Co., Ltd. (which firm had performed accounting services for Elmas, ROBL and other related entities up until approximately May of 1985), support the Receiver's assertion that Lynx was the predecessor in interest to Paychute.

In further support of his argument, the Receiver contends that Elmas Mining Corporation (which has been stipulated to be included in the Receivership) offered to investors the right, title and interest to a specific, divided mineral claim for the recovery of gold. In approximately April of 1984, Elmas Mining had contracted with and advanced working capital to Lynx and its successor Paychute. Pursuant to its agreement with Elmas Mining, Lynx was obligated to provide certain mining services including mine site management and improvement and mining processes. Lynx also contracted with the individual investors to extract, process and deliver gold from the individual's mineral claims.

Jay Landis, who is listed in the Mining Services Offering as a Director of Lynx, also appears to have been an authorized signatory on or an officer of Paychute as reflected on a check dated March 22, 1985, drawn on the Paychute account at the Valley Bank of Nevada and made payable to Lynx in the sum of $30,000.00.

Following a review of accounting ledgers reflecting cash inflows, the Receiver determined that Lynx received the following payments:

1. March, 1985: $75,000.00 from Elmas
2. December, 1983: $100,000.00 from Trust Equities
3. January, 1982 through February, 1985: $1,686,500.00 from Elmas Mining

In addition, supporting documentation has been discovered evidencing transfers totaling $200,000.00 from Elmas Mining to Lynx.

Notes to the Financial Statement prepared by the Pangborn & Co. accounting firm for Elmas Mining reveal that a $1,313,817 advance to Lynx stated no interest and had an indeterminable payment period. The financial statement also revealed that Lynx' operations had not generated earnings as of October 31, 1983.

Thus, although defendants Attarian and Smith are not listed as officers and directors of Lynx, sufficient evidence exists to include Lynx within the Receivership.

*Eden Financial*

 Eden Financial Corporation (Eden) is a Nevada corporation incorporated on February 29, 1984. Pursuant to documents filed with the Secretary of State for the State of Nevada, Eden was incorporated by Laughlin Associates, Inc. Its officers include:

(a) defendant Smith, President;

(b) defendant Attarian, Secretary; and

(c) Phyllis Attarian, Treasurer.

Its principal place of business is listed as Reno, Nevada, and its corporate purpose is to engage in "all legal activities."

IMAC, already subject to the provisions of the Permanent Injunction, is a wholly-owned subsidiary of Eden. Upon review of ledgers maintained by IMAC and copies of cancelled checks, the Receiver determined that IMAC paid to Eden approximately $171,000.00. Of that sum, Eden received $5,000.00 as "advances" and $63,900.00 as a "loan." The sum of $2,280.48 was paid as a "loan" to an entity by the name of Eden Ins. Co., which may be affiliated with Eden. Moreover, from a previously unidentified account in the name of Eden at Security Pacific National Bank in Fresno, California, monthly automatic payments of $540.00 are continuing to be made for application to a home mortgage loan in the

name of defendant Attarian for a residence occupied by his daughter. The Court finds that Eden should be included within the Receivership.

*Arbour Financial*

■ Arbour Financial, N.V. (Arbour Financial) is not a Nevada corporation, and its place of incorporation, if any, is unknown. Arbour Financial may be a Cayman Island company which utilizes a London, England, office address. The Receiver was advised by Robert Attarian (defendant Attarian's son) that defendant Attarian utilized funds of ROBL and/or Elmas to purchase, through Arbour Financial, 800,-000 shares in Process Control, Inc. Process Control, Inc., an Arizona Electronics Company of which Robert Attarian is the Secretary, Vice-President and one of its Directors, is presently believed to be a third party entity, not specifically related to Elmas and/or ROBL. (The Receiver does note, however, that Process Control received payments totaling $150,000.00 out of ROBL/Elmas funds for an unaccountable purpose.)

In addition, a draft balance sheet of the Elmas companies prepared by Pangborn & Co. and dated March 29, 1985, listed an asset of $2,200,000 entitled Campbell National Bank. This $2,200,000 represented a loan made by Arbour Financial to certain persons who planned on subscribing to a stock offering made by Campbell bank. This demonstrates a comingling of Arbour and Elmas assets. This Court should be concerned that in the interests of justice, the corporate veil of Arbour should be pierced and, thus, the Receiver's motion should be granted.

*Truth Share, Inc.*

■ Truth Share, Inc. (Truth Share) is a Nevada corporation purported to be a non-profit organization engaging in "educational," "religious" and "charitable" activities. It was incorporated on May 24, 1984, by Laughlin Associates, Inc. Its officers include:

(a) defendant Attarian, President;

(b) Phyllis Attarian, Secretary; and

(c) Phyllis Attarian, Treasurer.

Defendants Attarian and Smith, and Phyllis Attarian, are also directors of Trust Share. Its principal place of business is Reno, Nevada. The address utilized by Truth Share is identical to that of Elmas and ROBL.

There are bank accounts in the name of Truth Share at Security Bank of Nevada, and one bank account at the Valley Bank of Nevada. As of December 4, 1984, the two accounts at Security Bank of Nevada were shown to have a balance of approximately $54,000.00. According to a bank statement from Valley Bank of Nevada dated June 19, 1984, a balance of approximately $8,000.00 existed in that account. The source and use of those funds have not as yet been determined, nor has a current balance been ascertained in either of those accounts.

The Receiver has demonstrated a similar business location, personal use of assets, and similar directors. In conjunction with the umbrella this Court noted above, Truth Share should be included within the Receivership. The Receiver's motion should, therefore, be granted.

*Elmatec, S.A.*

■ The Receiver has been unable to determine the legal status of Elmatec, S.A. (aka Elma Tec). By virtue of its "S.A." designation, it may be a foreign corporation. Corporate records on file with the Nevada Secretary of State reveal that Elmatec, S.A. is not a Nevada corporation.

Pursuant to ledgers and receipts evidencing wire transfers, however, it has been determined that Elmatec, S.A. received $9.5 million from ROBL. Those wire transfers occurred in October and December of 1984. Such funds were wire transferred from Security Bank of Nevada to Swiss Bank Corp., New York, for the account of Swiss Bank & Trust Corp., Grand Cayman in favor of Elmatec, S.A. One such wire transfer bears account number 0–573–359025–00 for Elmatec, S.A. at Swiss Bank & Trust Corp., Grand Cayman. The source of the funds transmitted via wire transfer were clearly from ROBL; however, the

business purpose for such transfers is unknown.

This Court is forced to find that this transfer standing alone is insufficient to find Elmatec is an affiliate or subsidiary. However, it may be appropriate for the Receiver to place a high priority on either garnering more facts in support of piercing Elmatec's corporate veil or instituting a separate action against Elmatec.

*ETC Corp.*

ETC *Company* is already within the Receivership and, thus, subject to the Permanent Injunction freezing its assets. Documents and records reviewed thus far have evidenced the use of the designation "Corporation" with reference to ETC. Thus, ETC Corporation should be included within the Receivership.

*Association of Financial Consultants, Inc.*

■■■ The Association of Financial Consultants, Inc. (AFCI) is a Nevada corporation incorporated on May 10, 1984. Previously known as "Financial Accounting Services, Inc.", it changed its corporate name on August 27, 1984. Its officers are:

(a) Robert C. Isom, President;

(b) Phyllis W. Attarian, Secretary; and

(c) Phyllis W. Attarian, Treasurer.

Its mailing address was 2527 No. Carson St., Suite 205, Carson City, Nevada 89701.

The Receiver asserts that defendants Attarian and Smith organized AFCI to disseminate information covering "income producing vehicles" to financial consultants soliciting investments for ROBL for recommendation to investor groups in ROBL.

There was no opposition to the inclusion of this entity. However, the facts are insufficient to include AFCI in the Receivership. The Receiver's motion as to AFCI should be denied.

*Fortex Corp.*

■■■ Fortex Corporation (Fortex) was incorporated on March 22, 1985, in the State of Nevada by Laughlin Associates, Inc., the same organization utilized by defendants Attarian and Smith to incorporate many of their other related companies. Its officers include:

(a) Gordon DeLeon, President; and

(b) Helen Markowitz, Secretary.

Mr. DeLeon, one of the major financial consultants for Elmas and ROBL, has been subject to a desist and refrain order issued by the Commissioner of the California Department of Corporations in March of 1983 (this order was issued against Elmas and Defendants Attarian and Smith as well) enjoining the offer and sale of unregistered securities, and has been subpoenaed to produce documents pertaining to ROBL, Elmas, the Association of Financial Consultants (AFCI), International Management & Accounting Corporation (IMAC), and others, by regulatory agencies in a number of states.

Ms. Markowitz is defendant Attarian's daughter and lives in a residence located at 4718 E. Alamos, Fresno, California. As noted above, the home loan mortgage payment for that residence is automatically paid through a bank account maintained at Security Pacific Bank, Fresno Center Office, in the name of Eden Financial Corporation. (As discussed above, Eden will be included in the Receivership.)

Bank signature cards were executed by Mr. DeLeon and Ms. Markowitz as officers of Fortex and were utilized in connection with opening two accounts in April of 1985 at National InterCity Bank in Sunnyvale, California. Approximately $3 million was deposited into those accounts via wire transfers from an ETC (included in the Receivership) account at FSI Futures, Inc. Pursuant to additional documentation obtained from National InterCity Bank, it has been determined that almost the entire $3 million deposited was later disbursed to Elmas/ROBL investors and financial consultants, as follows:

(a) Paid to consultants: $1,550,419.00
(b) Paid to investors: $1,447,065.00

The Receiver has demonstrated that the funds in Fortex were comingled with assets of Elmas and ROBL. The Receiver's motion to include Fortex should be granted.

*Gold Equities, Limited*

██ Gold Equities, Limited (Gold Equities) is apparently a Cayman Island corporation. Defendant James Attarian is the Secretary and a director.

Following a review of ledgers and other records maintained by IMAC, it has been determined that records pertaining to Gold Equities were in fact maintained by IMAC and such records, including investor records, were basically maintained in the offices of IMAC and Compac in Reno, Nevada. Cash transfers were made from Trust Equities and IMAC to Gold Equities as follows:

1. July 18, 1984—three checks from Trust Equities in the following amounts:
 $10,000.00
 $ 7,000.00
 $29,432.00
2. November 20, 1984—one check from IMAC: $10,000.00.
3. November 17, 1984—one check from IMAC: $44,000.00.

The foregoing transfers total $100,-432.00. The Receiver was unable to verify if any additional transfers were made. Based upon the review of the limited Gold Equities records available to date, the Receiver determined that the above-referenced transfers were made utilizing assets of ROBL as investments in Gold Equities. The above-referenced transactions and the documentation reflect that individual depositors of ROBL were able directly to move monies from ROBL to Gold Equities. The fact that funds could be moved rather easily from an account with ROBL to another account within Gold Equities suggests that a direct relationship existed between ROBL and Gold Equities.

In addition, financial consultants for ROBL (and its predecessor, Trust Equities) also solicited investments from investors into Gold Equities. Moreover, Gold Equi-ties utilized the same address as Elmas and kept equipment, books and records of the corporation at Elmas' office. All of its money is listed in the Royal Bank of Canada and FSI futures under the name of ETC Co. which is included in this Receivership. Its office equipment is in the name of IMAC which is also included in the Receivership.

While this Court finds there is sufficient evidence to include Gold Equities within the Receivership, we are faced with the fact that on June 28, 1985, defendant James Attarian filed in this district for voluntary bankruptcy under Chapter Eleven. The bankruptcy petition lists cash assets of $3,000,000, gold assets of $500,000 and liabilities of approximately $1.5 million. The liabilities include $76,000 allegedly owing defendants Attarian and Smith for "wages for services."

Gold Equities' attorney, Bruce Beesley, Esq., admitted at the August 23, 1985, hearing that the sole purpose for filing for bankruptcy was to avoid the Receivership and argued this Court is without jurisdiction pursuant to 28 U.S.C. § 1471(e).

Beesley's argument that this Court is divested of jurisdiction by the filing of the bankruptcy petition pursuant to 28 U.S.C. § 1471(e) is wholly without merit. *See Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* 458 U.S. 50, 87, 102 S.Ct. 2858, 2880, 73 L.Ed.2d 598 (1982). Not only is 28 U.S.C. § 1471(e) no longer in force, but the filing of Gold Equities' petition for bankruptcy does not operate to stay the action before this Court. 11 U.S.C. § 362(b)(4). Section 362(b)(4) provides that the filing of the bankruptcy petition does not automatically operate as a stay in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power. 11 U.S.C. § 362(b)(4). "The policy behind this 'police or regulatory exception' to the automatic stay is to prevent the bankruptcy court from becoming a haven for wrongdoers." *Commodity Futures Trading Commission v. Co Petro Marketing,* 700 F.2d 1279, 1283 (9th Cir.1983) (discussing

the exception for the enforcement of a judgment under 11 U.S.C. § 362(b)(5)). *Cf. Securities and Exchange Commission v. First Financial Group of Texas*, 645 F.2d 429, 437 (5th Cir.1981) (relying on § 362(b)(4) and (5), the court found that a continuing civil enforcement proceeding brought by a governmental unit and the enforcement of injunctive relief obtained therein are exempted from the automatic stay provisions of § 362(a)). As noted above, the SEC brought this case in its regulatory capacity. Thus, the exception to the automatic stay provisions found in U.S.C. § 362(b)(4) enables this Court to properly rule on the Receiver's motion to include Gold Equities in the Receivership. We find that this motion should be granted.

Although we enter an order including the above entities within the Receivership estate, we do so without prejudice to further proceedings if proof surfaces that these entities have a separate and distinct character.

IT IS, THEREFORE, HEREBY ORDERED that the Permanent Injunction and Order Appointing Permanent Receiver shall be modified in accordance with this order.