**Robert A. BROWN, et al., Plaintiffs,**

v.

**KINROSS GOLD U.S.A., INC.; Kinross Gold Corp.; Kinam Gold, Inc.; and Robert M. Buchan, Defendants.**

No. 2:02–CV–0605–PMP (RJJ).

United States District Court, D. Nevada.

Jan. 23, 2008.

Douglas M. Risen, Lawrence Deutsch, Merrill G. Davidoff, Michael C. Dell'Angelo, Berger & Montague, P.C., Philadelphia, PA, Thomas F. Kummer, Kummer Kaempfer Bonner & Renshaw, Las Vegas, NV, Riginald H. Howe, Belmont, MA, for Plaintiffs.

Gregory M. Hess, Clark Waddoups, Justin P. Matkin, Robert S. Clark, Parr Waddoups Brown Gee & Loveless, PC, Salt Lake City, UT, Kirk B. Lenhard, Jones Vargas, Las Vegas, NV, for Defendants.

L.J. Coppedge, Kummer Kaempfer Bonner & Renshaw, Las Vegas, NV.

*ORDER*

PHILIP M. PRO, District Judge.

Presently before the Court are Defendants' Motion for Summary Judgment on Count I (Breach of Contract) of the Amended Class Action Complaint ("Defs.' Mot. for Summ. J. Count I") (Doc. # 219) and Defendants' Memorandum in Support of the Motion for Summary Judgment (Doc. # 220), both filed on September 7, 2007. Plaintiffs filed an Opposition (Doc. # 231) on October 29, 2007. Defendants filed a Reply (Doc. # 235) on December 5, 2007.

Also before the Court are Defendants' Motion for Summary Judgment on Count II (Breach of Fiduciary Duty) of the Amended Class Action Complaint ("Defs.' Mot. for Summ. J. Count II") (Doc. # 221) and Defendants' Memorandum in Support of the Motion for Summary Judgment (Doc. # 222), also filed on September 7, 2007. Plaintiffs filed an Opposition (Doc. # 232) on October 29, 2007. Defendants filed a Reply (Doc. # 247) on December 19, 2007, after this Court granted Defendants an extension of time to file their reply and leave to file excess pages. The Court held a hearing on both motions for summary judgment on December 18, 2007. (Mins. of Proceedings [Doc. # 246].)

## I. BACKGROUND

In August 1994, Amax Gold ("Amax"), the predecessor of Defendant Kinam Gold, Inc. ("Kinam"), issued 1,840,000 shares of $3.75 Series B Convertible Preferred Stock ("Preferred") to the public. (Am. Class Action Compl. [Doc. # 69] ¶ 24.) Amax issued the Preferred to raise necessary funds to continue the development of its "Fort Knox" gold mine in Alaska. (*Id.*) The Preferred was listed on the New York Stock Exchange until August 2001, when its listing was transferred to the American Stock Exchange. (*Id.* ¶ 29.) On June 1, 1998, Defendant Kinross Gold Corporation ("Kinross") acquired Amax. (*Id.* ¶ 37.) Amax then changed its name to Kinam and became a subsidiary of Defendant Kinross Gold USA, Inc. ("Kinross USA"), which is a wholly owned subsidiary of Kinross. (*Id.*) The Preferred, constituting three percent of Kinam's voting control, remained in the hands of third parties, while Kinross USA owned all of the Kinam common stock. (*Id.* ¶ 40.) During the acquisition, Kinross, through Kinross USA, advanced $256 million to Kinam, then recorded the $256 million as debt Kinam owed to Kinross USA, all of which was reported on Kinam's audited financial statements filed with the SEC. (*Id.* ¶ 42.) Kinross USA has carried the loan without charging interest or loan fees to Kinam. (*Id.*) The

Fort Knox mines, developed with the proceeds from the issuance of the Preferred, provided Kinross with 40% of its gold production and 50% of its gold reserves. (*Id.*) In total, the former Amax assets provided Kinross with approximately 75% of both its total annual gold productions and its total gold reserves. (*Id.* ¶ 84.)

After Kinross acquired Amax, the value of gold decreased, adversely affecting the Kinross organization. (*Id.* ¶ 46.) A Kinross press release attributed its losses to many factors, one of which was the significant drop of gold's spot price. (*Id.*) Defendants responded by suspending the quarterly dividends of the Preferred. (*Id.*)

Under the terms of the Preferred, once dividends on the Preferred had been suspended for six consecutive quarters, Preferred holders could elect two additional directors to Kinam's board. (*Id.* ¶ 47.) The sixth payment of dividends would have been in arrears in November 2001, and the Preferred would have become eligible to elect two additional directors to Kinam's Board of Directors. (*Id.*) In May 2001, Kinross moved Kinam's state of incorporation from Delaware to Nevada. (*Id.* ¶ 48.) This move prevented holders of the Preferred from bringing a petition to put Kinam into state insolvency proceedings. (*Id.* ¶ 50.) Insolvency would have allowed holders of the Preferred to apply for the appointment of a receiver. (*Id.* ¶ 48.)

On June 12, 2001, Kinross and Kinam announced an agreement with Franklin Funds to exchange 800,000 shares of Preferred for 21.5 million common shares of Kinross ("Franklin Transaction"). (*Id.* ¶ 56.) This equates to a conversion rate of approximately 26.9 shares of Kinross common stock for one share of Preferred. In the five days preceding the Franklin Transaction, the average closing price of the Preferred was $8.025. (*Id.*) This means that, given the price of the Kinross common stock Franklin received, Kinross paid Franklin the equivalent of $25.80 per share of Preferred. (*Id.*) This is $17.725 per share more than the "market" price. (*Id.*)

On June 18, 2001, Kinross USA and Kinam announced agreements with two other holders of the Preferred to exchange over 2.6 million shares of Kinross's common stock for 145,000 shares of the Preferred ("Follow On Transactions"). (*Id.* ¶ 57.) These two other main shareholders exchanged their Preferred at a ratio that implied an effective price of $18.29 per share. (*Id.*) As a result of these transactions, Kinross USA owned 51.4% of the Preferred, thereby controlling 98.7% of the outstanding Kinam common and Preferred votes. (*Id.* ¶ 58.) Kinross treated these acquired shares as outstanding rather than redeemed, meaning Kinross could control any class vote of the Preferred, including any election of directors. (*Id.* ¶ 60.)

In February 2002, Kinross USA issued a Tender Offer to purchase all remaining publicly held Preferred shares at $16.00 per share. (*Id.* ¶ 63.) Kinam's board had appointed a special committee to determine whether the $16.00 offer was fair to non-affiliated holders of Preferred shares. (*Id.* ¶ 62.) This committee consisted of the three members of Kinam's board who were not employees of Kinam or Kinross. (*Id.* ¶ 62.) These members were, however, directors of Kinross and holders of its common shares and options. (*Id.*) The committee employed the firm of Raymond James, which had experience in the valuation of businesses and securities, to provide a fairness opinion. (*Id.*) The committee did not recommend whether the Preferred shareholders should accept the offer. (*Id.* ¶ 70.)

In its review, Raymond James analyzed and reviewed Kinam's net asset value, Kinross's and Kinam's financial statements, stock trading activity and prices, investment bank reports of the industry, other similar tender offers, and other "going-private" and "recent merger and acquisition transactions in the mining industry." (*Id.* ¶ 98.) Raymond James also had discussions with Kinam's auditors and legal advisors. (*Id.*) Based on Preferred's trading history, Raymond James concluded an offer between $15 and $18 per share would represent a premium of between 68% and 101% over the 365–day average price. (*Id.* ¶ 74.) Raymond James concluded that a Tender Offer price of $16 was fair and within the range of values it had provided in its report. (*Id.* ¶ 70; Mot. for Summ. J. Count I, Ex. 44 at 6.)

The Tender Offer communicated Kinross's offer to purchase all publicly held shares of the Preferred. (Mot. for Summ. J. Count I, Ex. 44 at 1.) The Offer also indicated non-tendering shareholders could be left with illiquid securities. (*Id.*, Ex. 44 at 8, 9.) The Offer further indicated Kinross intended to complete a merger and that a future opportunity to receive cash for shares of the Preferred was not guaranteed. (*Id.*)

At the conclusion of the Tender Offer period, Kinam Preferred shareholders tendered 652,992 Preferred shares, which constituted 73% of the outstanding 894,600 Preferred shares not previously owned by Kinross USA. (Am. Class Action Compl. ¶ 78.) Plaintiffs held interests in approximately 56,100 Preferred shares. (*Id.* ¶¶ 5–9.) Some Plaintiffs tendered their shares, while others did not. (*Id.*)

Plaintiffs brought suit, alleging breach of contract (Count I), breach of fiduciary duty (Count II), violation of the best price rule (Count III), violation of Nevada's anti-racketeering law (Count IV), and breach of fiduciary duties in violation of § 13(e) and § 10(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") (Count V), violation of § 13(e), § 10(b)(5) and Rules 10b–5(a) and (c), and 13e–4(j)(1)(I) and (iii) of the Exchange Act (Count VI), and violation of § 20(a) of the Exchange Act (Count VII). This Court granted Defendants summary judgment on Count III (Best Price Rule) and Count IV (Nevada Rico). (Doc. # 109, Order dated May 27, 2005, 378 F.Supp.2d 1280.) This Court also dismissed with prejudice Counts V, VI, and VII. (Doc. # 83, Order dated Nov. 2, 2004.) Defendants now move for summary judgment on Plaintiffs' remaining claims: Count I (Breach of Contract) and Count II (Breach of Fiduciary Duty).

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" demonstrate "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The substantive law defines which facts are material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a party fails to offer evidence sufficient to establish an element essential to its case, no genuine issue of material fact

can exist, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.2000). The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial. *Id.; Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). All justifiable inferences must be viewed in the light most favorable to the non-moving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001).

## III. DISCUSSION

### A. BREACH OF CONTRACT (COUNT I)

The Charter, or the terms of the Preferred, comprise the contract at issue between the holders of the Preferred and the corporation. (Opp'n Count I, Ex. EE.) Plaintiffs allege Defendants, as alter egos, breached the Preferred's terms in several ways, including by improperly treating converted or redeemed shares as outstanding and eligible to vote. In their motion for summary judgment, Defendants argue Plaintiffs' claim fails as a matter of law because Kinross engaged in the actions constituting the alleged breach and, because Kinross is not a party to the contract, the Articles do not govern Kinross. Defendants further argue Plaintiffs cannot demonstrate Defendants are alter egos and no breach occurred. Finally, Defen-

dants argue they are entitled to summary judgment because Plaintiffs suffered no damages, but rather reaped a profit. Plaintiffs argue in response Kinross, Kinross USA, and Kinam are alter egos and should be treated as one entity, bound by the Articles' contractual terms. Plaintiffs also argue they suffered damages resulting from Defendants' alleged breach.

### 1. Alter Ego Liability

Defendants argue Nevada law precludes using the alter ego doctrine to make a non-party to a contract liable for breach. Defendants further argue the alter ego doctrine can be invoked only to enforce an existing debt, not to create contractual liability.

■ A plaintiff in a breach of contract action must "show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 920–21 (D.Nev.2006) (citing *Richardson v. Jones*, 1 Nev. 405, 405 (1865)). The parties do not dispute the existence of a valid contract, but rather dispute who the contract binds.

■ For a plaintiff to bring a breach of contract action against a defendant, the plaintiff and defendant must have a contractual relationship. *See Vargas v. Cal. St. Auto. Ass'n Inter–Ins. Bureau*, 788 F.Supp. 462, 464 (D.Nev.1992). Typically, only a party to a contract can breach it. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *W. States Constr., Inc. v. Michoff*, 108 Nev. 931, 840 P.2d 1220, 1225 (1992). While no Nevada law speaks directly to this issue, other courts, including the United States Court of Appeals for the Ninth Circuit, have imputed contractual liability to an alter ego.

■ "Where the alter ego doctrine applies, ... the two corporations are treated as one for purposes of determining liability." *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1490 (9th Cir.1983). The effect of applying the alter ego doctrine is that the corporation and the individual who dominates it are treated as one, "so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or otherwise, both are equally bound...." *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir.1974) (quotation and citation omitted). For example, the Ninth Circuit held recently that a breach of contract claim could proceed if a defendant was an alter ego or successor in interest to a party to the contract. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 803 (9th Cir.2003). *See also Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 532 (5th Cir.2000) (noting arbitration agreements may bind non-signatories under alter ego theory of veil-piercing); *Sheet Metal Workers Int'l Ass'n, Local No. 359, AFL–CIO v. Ariz. Mech. & Stainless, Inc.*, 863 F.2d 647, 651 (9th Cir.1988) (holding alter ego theory contractually binds successor companies, and that a collective bargaining agreement between a union and a non-signatory's alter ego will bind the non-signatory). Additionally, the Nevada Supreme Court has implied the alter ego doctrine applies in a contractual context. *Bates v. Chronister*, 100 Nev. 675, 691 P.2d 865, 869 (1984) (noting a nonparty who is an alter ego could function as a party to a contract for purposes of rescinding the contract); *Eaton v. J.H., Inc.*, 94 Nev. 446, 581 P.2d 14, 18 (1978) (holding that because the defendant's personal liability under the contract was not contested, it was unnecessary for the court to address whether he would also be liable under an alter ego theory).

Because Nevada law implicitly sanctions contractual alter ego liability and other courts specifically have applied it, Kinam's contractual liability could extend to the Kinross Defendants, if they are alter egos of Kinam. The Court will not grant summary judgment on this basis because Defendants are not excluded from liability as a matter of law.

**2. Kinross and Kinam as Alter Egos**

■ Defendants argue Plaintiffs cannot demonstrate Kinross and Kinam are alter egos because there is insufficient evidence to support unity of ownership and interest between Kinross and Kinam, and no manifest injustice results from recognizing Defendants' corporate separateness. Plaintiffs argue Defendants are alter egos because Kinross controlled Kinam and used that control to Kinross's benefit.

■ Nevada generally treats corporations and shareholders as separate legal entities. *LFC Mktg. Group, Inc. v. Loomis*, 116 Nev. 896, 8 P.3d 841, 845 (2000). However, Nevada has long recognized the equitable remedy of piercing the corporate veil where the corporate form is abused and the corporation acts as the alter ego of a controlling individual. *Id.* at 845–46. The alter ego doctrine applies if "(a) The corporation is influenced and governed by the stockholder, director or officer; (b) There is such a unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and (c) Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice." Nev.Rev.Stat. § 78.747. *See also LFC Mktg. Group, Inc.*, 8 P.3d at 846–47; *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 963 P.2d 488, 496 (1998).

■ The party propounding the alter ego doctrine and attempting to pierce the

corporate veil must establish the elements the statute articulates. *Lorenz*, 963 P.2d at 496. However, "[t]here is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case." *Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 747 P.2d 884, 887 (1987). The individual circumstances and interests of justice control. *LFC Mktg. Group, Inc.*, 8 P.3d at 847. "[F]raud or other wrongful purpose need not be proven." *SEC v. Elmas Trading Corp.*, 620 F.Supp. 231, 233 (D.Nev. 1985). It is sufficient to show recognizing the separate corporate existence would bring about an inequitable result. *Id.*

■ Defendants admit their relationship with Kinam satisfies the first statutory element because Kinross and Kinross USA influenced and governed Kinam. The second element of the alter ego test requires a plaintiff to demonstrate the entities are inseparable from one another due to the degree of interest and ownership. The Nevada Supreme Court has articulated several factors that may indicate a unity of interest and ownership between two entities: commingling of funds, undercapitalization, unauthorized diversion of funds, treatment of corporate assets as the entity's own, and failure to observe corporate formalities. *Mallard Auto. Group, Ltd. v. LeClair Mgmt. Corp.*, 153 F.Supp.2d 1211, 1214 (D.Nev.2001) (citing *Lorenz*, 963 P.2d at 497). 'Such factors may indicate an alter ego relationship, but no one factor is determinative. *Id.* (citing *Lorenz*, 963 P.2d at 497). The "ownership of corporate shares is a strong factor favoring unity of ownership and interest." *LFC Mktg. Group, Inc.*, 8 P.3d at 847. However, the absence of corporate ownership is not dispositive. *Id.*

Upon completion of the merger, Kinross exercised majority ownership and control over Kinam and its assets, which is a "strong factor" in evaluating interest and ownership. Additionally, after the Franklin and Follow–On Transactions, Kinross also owned and controlled the majority of the Preferred. Plaintiffs offered evidence Kinross treated Kinam's assets as their own because a large percentage of Kinross's gold production was due to assets Kinam owned. (Opp'n Count I, Ex. 142 at 7–8, 37, 38.) Kinross has, at times, been candid about its degree of control over Kinam. For instance, Kinross's Tender Offer stated, in relevant part:

> We currently control the business, management and direction of Kinam. All of the members of the board of directors of Kinam, including the members of the special committee, are directors or officers of Kinross. In addition, all of the executive officers of Kinam are executive officers of Kinross. Kinross pays the salaries of all of the executive officers and does not charge Kinam for the management services provided by our directors and officers.

(Mot. for Summ. J. Count I, Ex. 44 at 6.) Kinross's Tender Offer also indicated a unity of interests such that Kinross managed Kinam to benefit itself:

> Since Kinross controls Kinam, the financial results are reported on a consolidated basis … We have historically advanced funds to Kinam to pay for expenses and obligations that are not otherwise covered by Kinam's cash from operations. We have not charged Kinam interest on these advances. All of the foregoing [consequences of the tender offer] benefit Kinross and are not necessarily beneficial from the point of view of the non-affiliated holders.

(*Id.*, Ex. 44 at 13–14.)

■ The third requirement for application of the alter ego doctrine requires that

adherence to that corporate form would perpetuate a fraud or injustice. *Mallard Auto. Group, Ltd.*, 153 F.Supp.2d at 1216. It does not require fraud, or that a corporation was set up as a sham at its inception. *Id.*; *Polaris Indus. Corp.*, 747 P.2d at 886.

Plaintiffs have presented evidence that failing to pierce the corporate veil would promote injustice. Plaintiffs argue Defendants perpetuated an injustice by using the separate corporate identities of Kinross, Kinross USA, and Kinam to circumvent and defeat provisions of the Preferred that were specifically designed to guarantee shareholders equal treatment. Plaintiffs further argue if Kinross is permitted to engage in the actions that manipulate the rights of Kinam shareholders, all while fully controlling Kinam, Plaintiffs would have no recourse for their losses.

A genuine issue of material fact exists as to whether Kinross and Kinam are alter egos. The Court therefore will deny Defendants' motion for summary judgment on this basis.

### 3. Breach

Defendants argue they are entitled to summary judgment because the Franklin and Follow On Transactions did not constitute an improper redemption or conversion. Plaintiffs argue in response Defendants breached numerous terms of the Preferred, including treating redeemed or converted shares as outstanding, and violating the equal opportunity for enhanced conversion.

Factual disputes regarding breach of contract are issues for a jury. *State, Univ. & Cmty. Coll. Sys. v. Sutton*, 120 Nev. 972, 103 P.3d 8, 15 (2004). Plaintiffs claim Defendants breached Article 4C.(7) of the Charter, which provides, in relevant part:

> *Outstanding Shares.* For purposes of these Articles of Incorporation, all shares of Series B Convertible Preferred Stock shall be deemed outstanding except (I) from the date fixed for redemption pursuant to Section 4, all shares of Series B Convertible Preferred Stock that have been so called for redemption under Section 4 if the cash necessary for payment of the Redemption Price irrevocably has been set aside; (ii) from the date of surrender of certificates representing shares of Series B Convertible Preferred Stock, all shares of Series B Convertible Preferred Stock converted into Kinross Stock; and (iii) from the date of registration of transfer, all shares of Series B Convertible Preferred Stock held of record by the Corporation or any subsidiary of the Corporation.

(Opp'n Count I, Ex. 310 at KNM01330). Plaintiffs claim according to this provision the Preferred shares Kinross holds are not outstanding shares eligible to vote; they are either shares acquired by conversion, or constructively redeemed shares. Plaintiffs further claim that because Kinross's Preferred shares were redeemed or converted rather than outstanding, the Kinross Defendants breached this provision by treating its Preferred shares as outstanding and eligible to vote. In their motion for summary judgment, Defendants concede that if Defendants are alter egos, their actions would constitute a breach. (Memo in Support of Mot. for Summ. J. Count I at 29 ("Plaintiffs also allege it was a breach of contract to treat the Preferred shares acquired from Franklin ... as outstanding and entitled to vote ... [T]hat technically would be

true if Kinross, Kinross USA, and Kinam were one and the same entity bound by Kinam's Articles....")) Because this Court has determined there exists a genuine issue of fact as to Defendants' alter ego status, and Defendants admit if Plaintiffs' alter ego theory prevails, a breach occurred, it follows that there is a genuine factual issue regarding the breach of Article 4C.(7). Thus, Defendants are not entitled to summary judgment on Plaintiffs' claim for breach of contract.

### 4. Damages

Defendants argue because most Plaintiffs ultimately earned a profit, they did not suffer damages. Defendants further argue that as such Plaintiffs cannot satisfy the damages element of their breach of contract claim. Plaintiffs argue in response the breaches they allege damaged the value of their shares and cost them dividend payments.

■ Lost profits commonly constitute damages in breach of contract actions. *Eaton v. J.H., Inc.,* 94 Nev. 446, 581 P.2d 14, 17 (1978). Lost profits are what the profits would have been had the contract not been breached. *Id.* Thus, for plaintiffs to suffer damages, they only need earn a smaller profit than they otherwise would have earned without a breach.

That some Plaintiffs may have made an overall profit does not preclude a finding of damages. The alleged breaches affected Plaintiffs' receipt of dividends, ability to tender their shares at a premium, and ability to influence the board by electing additional directors. Defendants have not demonstrated the absence of a genuine issue of material fact concerning damages. Defendants therefore are not entitled to summary judgment based on a lack of damages.

Genuine issues of material fact exist regarding Plaintiffs' breach of contract claim (Count I). The Court will deny Defendants' motion for summary judgment as to Count I.

## B. BREACH OF FIDUCIARY DUTY (COUNT II)

Plaintiffs allege Defendants, as majority shareholders, breached the fiduciary duties they owed Plaintiffs as minority shareholders by entering the Franklin Transaction for the purpose of blocking the Preferred shareholders' ability to elect two additional Kinam directors. Plaintiffs also allege the Kinross Defendants breached their fiduciary duties by issuing the Tender Offer because the Offer was coercive, and the consideration of $16 per Preferred share was not "fair value." Plaintiffs' claim against Defendant Robert Buchan ("Buchan") is based on the same transactions, but under the theory that Buchan was a control person.

In their motion for summary judgment, Defendants argue Plaintiffs' claim fails as a matter of law because the Franklin Transaction cannot support a breach of fiduciary duty claim, the Tender Offer was not coercive and offered a fair price, and because Plaintiffs reaped substantial profits, regardless of whether they held or tendered their Preferred shares. Thus, Defendants argue, Plaintiffs suffered no damages. Defendants also argue Plaintiffs have no claim against Defendant Buchan because he was not a majority shareholder of any of the Defendant corporations, and as director and CEO of Kinross, his duties ran to Kinross and its shareholders, not Kinam shareholders. Plaintiffs in turn argue that the Franklin and Follow On Transactions were a "predicate breach" in that those transactions allowed Defendants

to gain control and make the coercive Tender Offer.

### 1. Franklin Transaction

 Defendants argue the Franklin Transaction cannot support a breach of fiduciary duty claim as a matter of law because majority shareholders owe no duty to preserve Preferred shareholders' rights to elect additional directors. Defendants further argue that majority shareholders have no fiduciary duty to avoid acquiring more shares to gain voting control of a class of securities. Plaintiffs argue the Franklin Transaction was a predicate breach of fiduciary duty because Defendants entered the transaction for the purpose of gaining control and the subsequent ability to issue a wrongful tender offer.

The Franklin Transaction cannot support a breach of fiduciary duty action under Plaintiffs' proposed theory of "predicate breach." Plaintiffs offer and this Court could find no legal support that taking measures that allow for a future breach of fiduciary duty itself constitutes a breach of fiduciary duty. This Court therefore will grant Defendants' motion for summary judgment as to the breach of fiduciary duty claim premised upon the Franklin Transaction.

### 2. Tender Offer

Defendants argue Plaintiffs' fiduciary duty claim concerning the Tender Offer fails because the Offer was not misleading, not coercive, and the price was fair. (*Id.* at 21.) Defendants further argue that Plaintiffs suffered no damages as the result of the tender offer. Plaintiffs argue the Tender Offer was actionably coercive, and the price was not fair. Plaintiffs also urge this Court to adopt the standard employed in *In re Pure Resources, Inc.,*

*Shareholders Litigation,* 808 A.2d 421 (Del.Ch.2002), and evaluate the Tender Offer for under the "entire fairness" standard.

### a. Applicable Standard

 A breach of fiduciary duty claim requires Plaintiffs to show the existence of a fiduciary duty, the breach of that duty, and that the breach proximately caused the damages. *Giles v. Gen. Motors Acceptance Corp.,* 494 F.3d 865, 880–81 (9th Cir.2007) (applying Nevada law); *see also Clark v. Lubritz,* 113 Nev. 1089, 944 P.2d 861, 866–67 (1997). The parties agree controlling shareholders owe a fiduciary duty to the minority shareholders. However, they disagree as to what standard the Court should employ in evaluating the Tender Offer.

The Nevada Supreme Court has not addressed this issue. Where there is no Nevada precedent on point this Court must predict how the Nevada Supreme Court would decide the question. Because the Nevada Supreme Court frequently looks to the Delaware Supreme Court and the Delaware Courts of Chancery as persuasive authorities on questions of corporation law, this Court often looks to those sources to predict how the Nevada Supreme Court would decide the question. *Shoen v. AMERCO,* 885 F.Supp. 1332, 1341 n. 20 (D.Nev.1994); *see also Hilton Hotels Corp. v. ITT Corp.,* 978 F.Supp. 1342, 1347 (D.Nev.1997).

 Under established Delaware law, if majority shareholders attempt to acquire the minority shares through a tender offer, the court inquires into the fairness of the transaction only upon a finding that the offer was not voluntary. *Solomon v. Pathe Commc'n Corp.,* 672 A.2d 35, 39 (Del.1996). An offer is not voluntary if it

is coercive, or if it contains false or misleading disclosures. *Id.* If the offer is totally voluntary, majority shareholders are under no obligation to offer a fair price, and the inquiry ends. *Id.* at 40. If, however, the offer is actionably coercive, the court must evaluate whether the majority shareholders offered fair value. *See Gradient OC Master Ltd. v. NBC Universal, Inc.,* 930 A.2d 104, 117 (Del.Ch.2007).

Plaintiffs ask this Court to evaluate the Tender Offer under an "entire fairness" standard, as recently articulated in *Pure Resources,* 808 A.2d 421 (Del.Ch.2002). Similar to the established approach, the *Pure Resources* approach first examines whether a tender offer was voluntary or actionably coercive. If the offer is actionably coercive, the offer must meet an "entire fairness" standard, which entails evaluating both whether the offer price constituted fair value and whether the offer was the product of fair dealing. *Id.* However, the Delaware Supreme Court has not had occasion to address the new *Pure Resources* standard. In attempting to decide this issue as the Nevada Supreme Court would, this Court will apply the established "fair value" standard.

### b. Coerciveness of Offer

The Court first must inquire whether a tender offer is "actionably" or "wrongfully" coercive. Defendants argue that the Offer was not coercive, and the fact that 25% of Preferred shareholders elected not to tender their shares is "persuasive proof" of that. Plaintiffs argue in response that Defendants' 25% figure is misleading, and that even if it were not, such a fact would not decisively support a claim of voluntariness. Plaintiffs further argue the Offer was coercive because it does not meet the established standard of "totally voluntary" and moreover fails the

three-part test developed by the *Pure Resources* court.

A tender offer is actionably coercive if it "threatens to extinguish or dilute a percentage ownership interest in relation to the interest of other stockholders;" or "induces shareholders who were the victims of inequitable action to tender for reasons unrelated to the economic merits of the offer." *Weiss v. Samsonite Corp.,* 741 A.2d 366, 372 (Del.Ch.1999); *see also Gradient OC Master, Ltd.,* 930 A.2d at 117. A tender offer is not actionably coercive simply because it includes a market premium designed to induce share participation, or includes a premium but limits participation. *Gradient OC Master, Ltd.,* 930 A.2d at 120. A tender offer is actionably coercive, however, if it " 'threatens to extinguish or dilute a percentage ownership interest in relation to the interests of other stockholders.' " *Id.* at 117 (quoting *Weiss,* 741 A.2d at 366). For example, where an offering statement discloses that management would delist the shares of the shareholders that did not tender, the offer is wrongfully coercive because there would be no reliable market for the shares. *Weiss,* 741 A.2d at 372 (citing *Eisenberg v. Chicago Milwaukee Corp.,* 537 A.2d 1051, 1056 (Del.Ch.1987)).

Likewise, an offer is actionably coercive where a shareholder who elects not to tender is likely to experience a substantial loss in the market value of his shares because the shareholder does not have a free choice between two options with economic merit. *Gradient OC Master, Ltd.,* 930 A.2d at 120. Similarly, where a tender offer price does not reflect the true value of the shares and is accompanied by an intention to delist, the offer is actionably coercive. *Id.* Additionally, the

*Pure Resources* court articulated a test based on the relevant precedent, holding an offer is non-coercive "only when (1) it is subject to a non-waivable majority of the minority tender condition; (2) the controlling stockholder promises to consummate a prompt ... merger at the same price if it obtains more than 90% of the shares; and (3) the controlling stockholder made no attributive threats." *Pure Resources*, 808 A.2d at 445. Though this Court declines to apply the new *Pure Resources* standard, the *Pure Resources* criteria used to determine the coerciveness of a tender offer are instructive and based on established law.

A genuine issue of material fact exists as to whether the Tender Offer was actionably coercive. The tender offer has characteristics relevant decisional law identify as coercive, and does not satisfy the three prongs the *Pure Resources* court articulated. Defendants' Tender Offer contains the coercive elements of expressing an intention to delist the stock and cease financial reporting. The Offer also expresses a likelihood that the shares of those who do not tender will likely experience a substantial loss of market value. Moreover, the Offer does not provide assurances Defendants will take particular action if the merger is completed, or that the price will remain constant.

The Tender Offer was actionably coercive as defined not only by prior law, but also under *Pure Resources*. Regarding the first of the *Pure Resources* prongs, the Offer was not subject to a majority of the minority vote provision. The Offer states explicitly, "the tender offer is not subject to approval by the majority of the non-affiliated holders." (Mot. for Summ. J. Count I, Ex. 44 at 10.) The Offer also was "not conditioned upon a minimum number of shares being tendered." (*Id.*, Ex. 44 at

1.) The Offer likewise does not meet the second prong because, not only did the offer not guarantee a prompt merger at the same price, it expressly disclaimed such a guarantee, stating that "there is no guarantee that such a transaction will be completed at a particular price or at all." (Mot. for Summ. J., Ex. 44 at 8.) The Offer further stated that following the completion of the Offer, "Kinam intends to and expects to pursue whatever strategies are then available to it to force out, by merger, recapitalization or otherwise, any remaining holder" of the Preferred at $16.00 per share or less. (*Id.*) This statement does not guarantee a merger at the same price, but rather explicitly articulates the possibility of offering less.

The Offer fails the third *Pure Resources* prong because the Offer contained retributive threats. The threats in the Tender included the threat to delist, threats to deregister and cease providing financial information, the threat to circumvent dissenters' rights, the threat to force out non-tenderors for less than $16.00, and threats not to pay dividends. What the *Pure Resources* court terms retributive threats overlap with the characteristics previous cases identified as coercive in nature. For instance, the "threat" to delist may render a Tender Offer coercive, and also falls under the *Pure Resources* rubric of "retributive threat."

Plaintiffs have raised a genuine issue of material fact regarding the coerciveness of the Tender Offer. Accordingly this Court will proceed to the issue of fair value.

### c. Fair Value

 Defendants argue they are entitled to summary judgment on Plaintiffs' fiduciary duty claim because the Tender Offer price was fair. Defendants further

argue the facts establish that the price was fair as a matter of law for reasons such as the public market trading price was lower than the offer price, and Franklin was willing to take less than $16 per share when it sold its Preferred shares to Kinross. Plaintiffs argue the price was not fair and further argue Defendants did not properly determine a fair value.

The parties have offered competing expert testimony about the fair value of the Preferred shares at the time of the Tender Offer. Defendants obtained a fairness opinion from Raymond James and argue that the market price was below the offered $16 per share. Plaintiffs, in response, offer the testimony of a valuation expert, Robert W. Brokaw, who opined the Tender Offer did not offer fair value. (Opp'n Count I, Ex. U, Brokaw Report.) Moreover, Plaintiffs contend at least one of Defendants' experts improperly valued the stock because his analysis analyzed the stock's value over one year before the Offer. (*Id.*) Because there is significant factual dispute about the fair value of the stock, this Court will deny summary judgment on this basis.

### 3. Damages

Defendants argue they are entitled to summary judgment because Plaintiffs suffered no damages, and thus an essential element of a cause of action for breach of fiduciary duty claim is absent. Plaintiffs argue in response that they suffered damages because the Tender Offer price did not represent fair value, and that profit based on the price ordinarily paid for the shares is irrelevant. Plaintiffs also argue some class members suffered an outright loss because they paid more than $16 per share.

Defendants are not entitled to summary judgment based on a lack of damages be-cause earning a profit from the Offer does not preclude damages. For the same reasons this Court discussed regarding Count I, suffering damages only requires Plaintiffs to be worse off—such as earning a smaller profit than they otherwise would have earned—as the result of the Offer. Because there is a question of fact regarding the fairness of the price, it follows that there also would exist a question of fact as to damages. If the Tender Offer price was not fair, Plaintiffs suffered damages amounting to the difference between the Tender Offer price and the fair value.

### 4. Defendant Buchan

Defendants argue because Defendant Buchan was neither a majority shareholder of the Defendant corporations, nor a director or officer of Kinam, he owed duties only to Kinross, and owed no fiduciary duties to Kinam shareholders. Plaintiffs argue Defendant Buchan is properly named in this claim because minority shareholders may bring a direct claim against directors for breach of fiduciary duty in effecting an objectionable corporate merger.

For Buchan to be liable for breach of fiduciary duties owed to holders of Kinam Preferred, there must exist such a duty. Buchan is not a majority shareholder of Kinam, so he does not owe duties to holders of the Preferred as minority shareholders. Buchan also is not a director or officer of Kinam, so does not owe fiduciary duties in that capacity. Implicit in Plaintiffs' claim, then, is the proposition that a director or officer owes fiduciary duties to the minority shareholders of other corporations that are alter egos of his own corporation, and that such a director would be liable directly for a breach of that duty. Plaintiffs, however, offer no legal support for the existence of such a duty or direct liability, and this Court could find none.

The Court therefore will grant Defendants summary judgment as to Defendant Buchan.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment on Count I (Breach of Contract) of the Amended Class Action Complaint (Doc. # 219) is hereby DENIED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment on Count II (Breach of Fiduciary Duty) of the Amended Class Action Complaint (Doc. # 221) is hereby GRANTED in part and DENIED in part. The motion is GRANTED with respect to Plaintiffs' claim for breach of fiduciary duty premised on the Franklin Transaction and with respect to Plaintiffs' claim for breach of fiduciary duty against Defendant Buchan. The motion is DENIED as to Plaintiffs' claims premised on the Tender Offer against Defendants Kinross, Kinross USA, and Kinam.

IT IS FURTHER ORDERED that the parties shall forthwith meet and confer and shall file a joint pretrial order no later than February 26, 2008.